[No. B233762. Second Dist., Div. Eight. Oct. 11, 2012.]

KENNETH CLEVELAND et al., Plaintiffs and Respondents, v.
ROBERT V. JOHNSON et al., Defendants and Appellants.

### COUNSEL

Reed Smith, Margaret M. Grignon and Anne M. Grignon for Defendant and Appellant Internet Specialties West, Inc.

Andrew P. Altholz for Defendant and Appellant Robert V. Johnson.

Hinshaw & Culbertson, Filomena E. Meyer and Desmond J. Hinds for Plaintiffs and Respondents.

### OPINION

**RUBIN, Acting P. J.—**

### SUMMARY

Kenneth Cleveland and William Bickley sued Robert V. Johnson and Internet Specialties West, Inc. (IS West). At trial before a jury, they asserted claims for breach of contract, breach of fiduciary duty, and false promise in connection with a $75,000 investment made pursuant to a February 1995 agreement. The jury found no false promise, but awarded more than $3.8

million for breach of contract, based on successor liability and ratification theories. The jury also found a breach of fiduciary duty and awarded punitive damages.

Defendants contend the findings of successor liability, ratification, and breach of fiduciary duty were not supported by substantial evidence; the damages awarded for breach of contract exceeded those allowed by the contract; and the punitive damages award must be reversed. They also assert instructional error in connection with the successor liability, ratification, and breach of fiduciary duty claims, and inconsistent special verdict findings.

We find no merit in any of these contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1993 to October 1995, Kenneth Cleveland was the accountant for Interactive Strategies, Inc. (ISI), a telecommunications company in the pay-per-call industry that provided equipment and processed phone calls, primarily involving adult-content material. Bickley was a Cleveland friend of long standing whose financial affairs Cleveland handled.

Defendant Johnson was ISI's president and a director and shareholder. ISI's other officers and shareholders were Edward Hastings and Brian Spitler. Early in 1995, Johnson approached Cleveland, telling him that he had an interesting proposal Cleveland should hear. Johnson and his partners, Spitler and Hastings, "were thinking about starting a different company" to provide access to the Internet. One of the reasons Johnson approached Cleveland was that anyone making such a risky investment would have to be familiar with Johnson, Spitler and Hastings and believe in their talent. The new business was to operate as an Internet service provider offering dial-up Internet connections to its customers. After several meetings with Johnson and Spitler and after reviewing a cost analysis and revenue projections Spitler provided, showing startup costs of $72,315, Cleveland and Bickley (collectively, Cleveland) agreed to invest $75,000 in the project. During the preinvestment meetings and calls, Johnson told Cleveland the new business "was going to be a separate division, and it was totally different than what they were doing on the other side of the telecommunications and in the adult information." Johnson told Cleveland the new Internet project "was going to be separate from what their current business was," and "it was going to be a separate division only until it could get going enough to become its own company." The separate operation of the Internet project from ISI's adult phone business was significant to Cleveland and Bickley for several reasons, including

Cleveland's belief ISI was losing money, Cleveland's personal beliefs, and Bickley's career, which had emphasized wholesome family entertainment.

Cleveland drafted a memorandum to ISI summarizing the agreement between ISI and Bickley/Cleveland Communications, and discussed its terms by telephone with Jerry Smith, the attorney for ISI, who had no changes and said "it looked fine." Johnson reviewed the agreement and had no changes. The agreement was then signed by Brian Spitler for ISI and by Cleveland for Bickley/Cleveland Communications.[1]

The terms of the agreement between ISI and Cleveland were these: Cleveland would provide $75,000 of capital "to be used by [ISI] to develop and implement a program to allow access to the InterNet information network." All expenditures of the capital provided were to be at ISI's sole discretion, so long as they were related to the Internet project. Net cash receipts of the project were defined as gross receipts from the sale of Internet software packages or Internet access fees, "less all applicable expenses directly related to the InterNet project." Cleveland was to receive 100 percent of the net cash receipts from the Internet project "until all capital invested by Bickley/Cleveland has been recouped. At that time Bickley/Cleveland Communications shall be paid 5% of gross receipts from the InterNet project."

During negotiations, Cleveland asked for a "say in management," but "Johnson and the others" were "adamant about not giving [Cleveland] a say in management or a place on the board" because "Johnson had the expertise and the equipment and what was needed to make it run," and Cleveland "had no problem with that." The quid pro quo was the gross receipts clause.

The agreement was signed and the $75,000 was provided to ISI on the same day, February 9, 1995. ISI recorded The Central Connection as a fictitious business name on February 17, 1995.

On February 14, 1995, Johnson, as president of ISI, entered into leasing agreements for the startup equipment necessary to operate The Central Connection. Kristina Di Paola (then Kristina Nolan) was hired in February 1995 as a full-time employee to run The Central Connection. Johnson and Spitler told her that The Central Connection was established to be separate from ISI, "because they wanted to be a community internet service provider" and wanted no conflicts with ISI's adult entertainment business. Johnson "did the early setup of all the hardware" and taught Di Paola about the equipment

---

[1] Cleveland described Bickley/Cleveland Communications as "an informal partnership."

racks, modem pool and the like. She considered Johnson her direct supervisor and reported to him. The Central Connection had its own office separate from and adjacent to the ISI offices, and its own phone number. Di Paola resigned in July 1995 and was replaced by Aaron Schultz.

At a lunch in August 1995, Hastings, who was the financial officer, told Cleveland that The Central Connection "was [limping] along and losing money" and "we weren't taking in clients as quickly as we thought . . . ." Hastings "thought it would still work because they were, they were still advertising, they were still bringing in customers, and he thought it still had a chance to go." Cleveland asked for some financial information, and on September 18, 1995, Hastings wrote a memo to Cleveland with an update on The Central Connection. Hastings enclosed a profit and loss statement for The Central Connection showing revenues of $4,500 per month against operational costs of $10,000 per month, and a summary report showing expenses of $43,000 ISI had paid for The Central Connection through August 1995 (exclusive of rent and utilities); Hastings observed that this would continue for several months and the overall expenses would exceed $75,000. Hastings's memo also stated that: "In regard to the repayment of your investment after much discussion and consideration repayment can only come from The Central Connection. We would propose that all monies above overhead for The Central Connection go to pay you back first. After you are paid back then Central Connection would pay back ISI for [its] investment."

This information and other inquiries Cleveland made in 1995 and 1996 satisfied him that his investment was not being misused. Cleveland spoke to Richard Marks, a lawyer for ISI, in October 1996, and understood from Marks that The Central Connection was still in operation. Cleveland knew it would "be a long time . . . before [The Central Connection] has enough revenue coming in to make up for all the losses and then have enough profit to trigger any kind of . . . repayment of the capital"; and that "if we make a profit they would let me know."

Then, in September 1998, Cleveland found out that financial officer Hastings had moved to Palm Springs in March or April of that year. Cleveland called Jerry Smith, ISI's lawyer, about Hastings's move, and asked Smith if Hastings was no longer with The Central Connection. Smith told Cleveland that he knew Hastings had moved, Spitler had left the area, and The Central Connection had failed. Smith (who was also Cleveland's lawyer) said he (Smith) was working with Johnson on a completely different project. A few months later, Cleveland encountered Johnson by chance, and Johnson, when asked, said that The Central Connection "didn't make it."

In May 2005, Cleveland was in the market for computer services for his company, and the consultant he had hired referred him to defendant IS West. In short order, Cleveland discovered that Johnson was the president of IS West. A brochure showed IS West's business was similar to that of The Central Connection—access to the Internet, Web page hosting "and pretty much everything that Central Connection was going to start doing." The brochure stated IS West was founded in 1996 and described it as the largest Internet service provider (ISP) in the Conejo Valley.

Cleveland accessed and reviewed IS West's Web page and the press releases included there. One of them, dated January 5, 1996, stated that IS West "will file to become a California Corporation. Established in 1995 as Central Connections, Internet Specialties West, Inc. will be a high speed ISP in Los Angeles and Ventura County." The press release showed IS West was located at the same business center location that had housed The Central Connection. Also on the Web site was an article from a community newspaper in February 2004 about IS West. According to the article, "It all started in 1995 when Johnson . . . founded IS West as a dial-up ISP with 30 modems and one employee in a 200-square foot building." (The writer later testified that the information would have come from a source at IS West.) The "30 modems" corresponded to the number of modems The Central Connection had when it began operations. Cleveland then found that IS West had been incorporated on June 19, 1996, predating the time in October 1996 when Cleveland "was being told Central Connection was still going on."

Cleveland then sought legal advice, and other information came to light.

According to August 1996 corporate documents, Johnson, Hastings, and Spitler were founding shareholders, officers and directors of IS West, along with Edward Rubottom. Jerry Smith incorporated IS West. According to the organizational minutes, all of the founding shareholders contributed "$50,000 cash and equipment" (in Rubottom's case, $50,000 of services rendered), although Smith, who was IS West's corporate counsel from 1996 to 2007, testified he had seen no documents "that reflect that $50,000 was paid in."[2]

By March 1997, when Gail Clancy joined IS West as its receptionist and bookkeeper, the company was operating as an ISP and had customers; her

---

[2] Rubottom attended no directors' meetings, paid nothing for his stock, and "had absolutely no say in the management of the company." Rubottom resigned from IS West in February 1998. On August 30, 1997, the directors of IS West (Johnson, Hastings, and Spitler) authorized the issuance of 5,000 shares of stock, representing 20 percent of the total issued, to Drew Kaplan, who began working for IS West in April 1997, "for the value of his services to the Corporation." Spitler and Hastings resigned from IS West in January 1998, and later that year, Johnson and Kaplan became 50/50 shareholders in IS West.

best estimate was "2 to 500 customers," whose records she was assigned to organize. She believed IS West had been in business "at least six months to a year" before she was hired.[3]

In April 1997, ISI assigned equipment leases to IS West, including equipment leased for The Central Connection in February 1995.

In the fall of 1997, Michael Freedman, an ISI minority shareholder, filed a derivative suit against ISI that included a claim relating to IS West (alleging that the shareholders of ISI had usurped a corporate opportunity with regard to the formation of IS West and other entities). Before that lawsuit was filed, Jerry Smith wrote to Freedman's lawyer for settlement purposes in April 1997. Smith stated that IS West "is a new corporation which became operational as of April 8, 1997. Prior to that date, the Internet operations were run as part of ISI dba The Central Connection, and the financial records are part of ISI's books."

In a declaration filed in the Freedman lawsuit in November 1997, Johnson stated: "IS West was initially a part of ISI called The Central Connection. The Central Connection developed and maintained web page sites, dial-up and high speed connection to the Internet for its clients. When the business of Central Connection developed, it consisted entirely of non-adult, community and more conservative businesses such as governments, chambers of commerce and churches. There developed a tremendous concern on the part of myself and the other officers and directors of ISI that if the clients of Central Connection learned of the adult nature of ISI it would cause the loss of clients (the majority of ISI's clients are adult in nature). Therefore, the Directors agreed that it was necessary to form a separate corporation to handle the work of Central Connection, and IS West was formed. I made this decision based upon the approximately $124,000 investment that ISI had in The Central Connection. IS West was formed and has its own books, records, office space and employees. ISI carries a loan on its books in the amount of $123,783.32 to IS West and IS West carries the same amount as a debt owed to ISI."[4]

Again in December 1997, Johnson signed a declaration stating that: "[IS West] was formed in order to preserve ISI's investment. As previously stated by me, ISI deals with adult oriented business and when Central Connection, a

---

[3] Two letters to an insurance company in January and March 1998, over the signature of Gail Terrasi (Clancy's maiden name) as office manager, state that "[a]s of January 1, 1998 Interactive Strategies Inc. [(ISI)] changed its name to Internet Specialties West Inc. [(IS West)]."

[4] At trial, Johnson testified: "There was about $124,000 investment that ISI did have in The Central Connection, part of which was Mr. Cleveland's 75,000."

d.b.a. of ISI developed its clientele, the clients were churches, private individuals, civic organizations and local governments. Thus [IS West] was formed to handle the business of Central Connection. The situation was potentially disastrous for both ISI and Central Connection. The only way to continue the work was in a corporation with no connection to the adult. A debt was placed on the books on [IS West] and a loan receivable on the books of ISI to reflect this transfer."

ISI stopped doing business in December 1997 and, unknown to Cleveland, was placed in involuntary bankruptcy in January 1998, after a lawsuit (unrelated to this case) resulted in a judgment against it of almost $1.4 million. A March 1998 filing in the bankruptcy court listing ISI's creditors did not include Cleveland.

IS West eventually became a lucrative business. IS West press releases showed $540,000 in sales in 1998, $3.5 million in 2002, $5 million in 2003, and more than $6 million in revenue in 2004.

Cleveland filed this lawsuit in December 2005, six months after his discovery of the information about IS West. Cleveland alleged a design and scheme "to hijack the internet service provider business enterprise then known as Central Connection, for [defendants'] own use and profit without the burden of the obligations owed to [Cleveland]." Cleveland sought damages, both compensatory and punitive, an accounting, and an order requiring IS West to convey to Cleveland $75,000, 5 percent of IS West's gross receipts for the last 10 years (presumably from 1995 when the agreement was signed to 2005 when the suit was filed), and 5 percent of all future gross receipts of IS West.

The case was tried to a jury in February and March 2011 with IS West and Johnson as defendants. Cleveland's breach of contract cause of action rested on the theory that ISI and Johnson were promoters of The Central Connection who induced Cleveland to provide the seed money investment and entered into a preincorporation agreement with Cleveland, and that IS West was liable for breach of that agreement, both as the successor to ISI doing business as The Central Connection, and on a ratification theory. Cleveland asserted that IS West owed fiduciary duties to its investors, and that Johnson as a promoter had a fiduciary duty to investors to disclose all material facts and not to use his position to gain any advantage over the investors; these fiduciary duties were breached when defendants misrepresented The Central Connection's demise and concealed its metamorphosis into IS West to avoid IS West's obligations to Cleveland. Cleveland also claimed defendants induced Cleveland to invest in The Central Connection with promises they never intended to fulfill.

Defendants filed a motion to bifurcate the trial into two phases: trial by the court on equitable issues (principally successor liability) followed by a jury trial on any remaining issues. The trial court denied the motion, ruling that "both the equitable and factual issues are intertwined; that the witnesses would be virtually the same in many of these areas."

The jury rendered a special verdict, including findings that Johnson and ISI—defined as "Interactive Strategies, Inc. dba The Central Connection"—were the promoters who induced Cleveland to enter into the contract; that ISI was later incorporated into IS West; that IS West was the successor to ISI; that IS West ratified the preincorporation contract of ISI; that the money Cleveland paid to ISI in 1995 was an investment, not a loan; and that Cleveland's damages were $3,826,000. The jury found no false promise to Cleveland to induce him to enter into the contract.

On Cleveland's breach of fiduciary claim, the jury found Johnson and ISI owed Cleveland a fiduciary duty as promoters; that IS West owed Cleveland a fiduciary duty; that Johnson owed Cleveland a fiduciary duty as an officer and director of IS West; that both defendants knowingly acted against Cleveland's interests by failing to disclose material facts to Cleveland; that both defendants breached their fiduciary duties; that Cleveland was harmed and defendants' conduct was a cause of the harm; that Cleveland's damages under the claim for breach of fiduciary duty were zero; and that both defendants acted with malice, oppression or fraud, entitling Cleveland to punitive damages.[5]

Because of the finding there were no damages on Cleveland's breach of fiduciary duty claim, a dispute arose on whether to proceed with the punitive damages phase of the trial. Over defense objections, the trial court submitted supplemental questions to the jury. The jury answered "yes" to questions asking if the award of zero damages was because (1) "[y]ou believed that the damages for Breach of Fiduciary Duty were duplicative of the damages you already awarded for Breach of Contract," and (2) "[y]ou did not know how to calculate Breach of Fiduciary Duty damages." The jury answered "no" to the question asking if the award of zero damages was because "[y]ou found that even though Plaintiffs were harmed . . . they had zero damages."

In the second phase of the trial, the jury awarded Cleveland punitive damages of $500,000 against Johnson and $500,000 against IS West.

---

[5] The jury also rejected defendants' statute of limitations defense, and that finding is not at issue in this appeal. The trial court had previously granted defendants' motion for summary judgment on this ground, a ruling reversed by this court in *Cleveland v. Internet Specialties West, Inc.* (2009) 171 Cal.App.4th 24 [88 Cal.Rptr.3d 892] (whether Cleveland exercised reasonable diligence in discovering his injury was a question for the trier of fact to decide).

Judgment was entered on the jury's verdict. The trial court denied defendants' motion for judgment notwithstanding the verdict or in the alternative for a new trial, and this appeal followed.

## DISCUSSION

Defendants contend the verdicts are not supported by substantial evidence; the breach of contract damages exceed those allowed by the contract; and, because there was insufficient evidence of the breach of fiduciary duty claim, the punitive damages award must be reversed. Alternatively, defendants contend they are entitled to a new trial on grounds of instructional error (specifically, the instructions on successor liability, ratification, and breach of fiduciary duty) and inconsistent special verdict findings. We find no merit in these contentions, and treat them in turn.

1. *The Substantial Evidence Claims—Breach of Contract—Successor Liability*

Defendants contend there are three independent and alternative grounds for reversing the jury's verdict on Cleveland's breach of contract claim and directing entry of judgment in favor of IS West. IS West cannot be liable as a successor of ISI, they say, because (1) ISI did not transfer its principal assets to IS West, (2) ISI retained its separate identity after "the asset transfer" (the assignment of equipment leases to IS West in April 1997) and so IS West cannot be a "mere continuation" of ISI or be deemed to have merged with ISI, and (3) there was no evidence IS West paid inadequate consideration for the transferred assets or that there was continuity of personnel between ISI and IS West.

Each of these contentions ignores the theory on which the case was tried and the jury was instructed: the claim that IS West was the successor of ISI "dba The Central Connection," *not* ISI as a corporate entity. There was plenty of evidence to show that IS West was a "mere continuation" of The Central Connection. Defendants can prevail in this case only if, as a matter of law, there can never be successor liability when a corporation takes over a specific line of business that was operated separately by another corporation—that is where, as here, the assets of a separately maintained business or division (The Central Connection) of a company (ISI) are transferred to a new company (IS West). While there may be circumstances under which successor liability in that situation would be inappropriate, that conclusion does not follow as a matter of law. Here, the facts were sufficient to support successor liability.

a. *The law on successor liability*

 Successor liability is almost always couched in terms of liability flowing from one corporation to another corporation. Thus, legal discussion

begins with "the rule ordinarily applied to the determination of whether a corporation purchasing the principal assets of another corporation assumes the other's liabilities." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3].) "As typically formulated the rule states that the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ibid.*)

■ As to the third basis for successor liability—where "the purchasing corporation is a mere continuation of the seller"—it has long been held that "corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old. Especially is this well settled when actual fraud or the rights of creditors are involved, under which circumstances the courts uniformly hold the new corporation liable for the debts of the former corporation." (*Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456, 461 [67 P.2d 376].) Further, *Ray v. Alad Corp.* tells us, ". . . California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of *one or both* of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." (*Ray v. Alad Corp., supra*, 19 Cal.3d at p. 29, italics added.)

b. *This case*

■ Here, we do not have one corporation formally purchasing the assets of another corporation. We have a corporation (ISI) which established a separate line of business (The Central Connection), assigning the leases for that business's equipment to another corporation (IS West). No other documentation exists concerning the transfer of assets. We may reasonably infer from Gail Clancy's testimony that the customers acquired by The Central Connection were taken over by IS West. We also have Johnson's declaration that he formed IS West to preserve ISI's $124,000 investment in The Central Connection ($75,000 of which, he testified, came from Cleveland), and ISI carried on its books a loan to IS West (and IS West carried a corresponding debt to ISI) in the amount of $123,783.32.

In accordance with these facts, the jury was instructed on successor liability in terms of the "mere continuation" basis for liability, with "ISI" defined as "ISI dba The Central Connection." Thus, the jury was told, "A corporation like IS West is liable for the debts, liabilities and obligations of ISI doing business as the Central Connection if you find that it is a 'mere continuation' of the latter."

Accordingly, the question comes down to one of law: may the doctrine of successor liability be applied to a corporation that succeeds to the assets of an unincorporated, but clearly separate, line of business of another corporation?

We see no reason why the doctrine of successor liability should not be applied, and defendants offer no case law expressly forbidding its application. Indeed, the authorities suggest otherwise. Witkin tells us, for example, after describing *Blank v. Olcovich Shoe Corp., supra*, 20 Cal.App.2d 456 (corporations cannot escape liability where new corporation is a continuation of the old), that "[t]he same approach has been used in cases where individuals incorporate, or where a corporation changes to a partnership." (9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 16, pp. 794–796, citing *D. N. & E. Walter & Co. v. Zuckerman* (1931) 214 Cal. 418, 420 [6 P.2d 251] *(Zuckerman)*; and *Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514 [203 P.2d 522] *(Gordon)*.) Thus:

—In *Zuckerman*, the Supreme Court found the defendant was liable to the plaintiff on his guarantee that payment would be made by ". . . Joe Goldberg, doing business under the name of 'Home Builders Supply Co.,' " even though Goldberg had later incorporated a company, and the merchandise for which the plaintiffs sought payment on the defendant's guarantee was furnished after the incorporation. *(Zuckerman, supra*, 214 Cal. at p. 419.) The court viewed the corporation as ". . . Goldberg's *alter ego*, completely owned, dominated and controlled by him," and "[t]his was also true as to the business formerly conducted by him under the same name." *(Id.* at p. 420.) The court observed that "[t]he separateness of the person and the corporation would of course be recognized if no inequitable results would follow. But where, as here, an inequitable result would follow the two should be considered as one . . . ." *(Ibid.)*

—In *Gordon*, the plaintiff prosecuted a personal injury action against a corporation, but when the plaintiff was injured, the company's structure had been changed to a partnership for tax reasons, with the business "continu[ing] as before," but without dissolving the corporation. When this was discovered at trial, the plaintiff decided to proceed against the corporation and not the partnership on an alter ego theory, and the trial court instructed that the corporation was an alter ego of the partnership and that "if one is liable, both

are liable." (*Gordon, supra,* 33 Cal.2d at p. 521.) The court agreed, citing "the rule that where the recognition of the fiction of separate corporate existence would foster an injustice or further a fraud the courts will refuse to recognize it. [Citations.] It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice. [Citations.] Here confusion would be promoted and an unjust result be accomplished if the maintenance of the two entities controlled by the same persons and having an identical name were permitted to frustrate a meritorious claim." (*Id.* at pp. 522–523.)

—In *Phillips, Spallas & Angstadt, LLP v. Fotouhi* (2011) 197 Cal.App.4th 1132 [128 Cal.Rptr.3d 320] (*Fotouhi*), the trial court applied principles of successor liability to find a law corporation was a continuation of a law partnership, and issued a charging order against both the partnership and the corporation, ordering them to pay a percentage of monthly revenues toward an unsatisfied judgment against a partner who was trying to avoid payment of a judgment against him. (*Id.* at pp. 1134–1135, 1141.)

These cases establish that the principles underlying the "mere continuation" theory of successor liability are not confined to corporations. A corporation may be a "mere continuation" of a partnership, as in *Fotouhi.* The very similar principles of alter ego liability will be applied where "the recognition of the fiction of separate corporate existence would foster an injustice or further a fraud . . . ." (*Gordon, supra,* 33 Cal.2d at p. 521; see *Zuckerman, supra,* 214 Cal. at p. 420 ["where . . . an inequitable result would follow the two [(individual proprietor and later corporation)] should be considered as one . . ."]; see also *McClellan v. Northridge Park Townhome Owners Assn.* (2001) 89 Cal.App.4th 746, 753 [107 Cal.Rptr.2d 702] (*McClellan*) ["the doctrine of disregarding the corporate entity in appropriate situations is not . . . narrowly drawn. [¶] Whether the theory relied on . . . is alter ego, piercing the corporate veil, or some other challenge to the fiction of the corporate entity, the doctrine 'limits the exercise of the corporate privilege to prevent its abuse.' "]; plaintiff's successor corporation theory was "consistent with the principle that '[i]f a corporation organizes another corporation with practically the same shareholders and directors, transfers all the assets but does not pay all the first corporation's debts, and continues to carry on the same business, the separate entities may be disregarded and the new corporation held liable for the obligations of the old' "]; cf. *Rawlings v. D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 900 [159 Cal.Rptr. 119] [in a strict products liability case applying *Ray v. Alad Corp.* principles, court rejected distinction that in *Ray v. Alad Corp.,* the predecessor manufacturer was a corporation

"while here it was a sole proprietorship. This difference, standing alone, is not conceptually significant . . . ."].)[6]

■ Defendants insist that The Central Connection was a fictitious business name, and correctly point out that doing business under a fictitious business name does not create a separate legal entity. (*Meller & Snyder v. R & T Properties, Inc.* (1998) 62 Cal.App.4th 1303, 1311 [73 Cal.Rptr.2d 740].) We do not see the relevance of this point. Successor liability issues are equitable issues to be examined "on their own unique facts" (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1122 [69 Cal.Rptr.3d 202] (*CenterPoint*)), and defendants offer no authority for the proposition that it "is simply a legal impossibility" for IS West to be the successor of ISI doing business as The Central Connection.

In short, the controlling point is that successor liability, like alter ego and similar principles, is an equitable doctrine. As with other equitable doctrines, "it is appropriate to examine successor liability issues on their own unique facts" and "[c]onsiderations of fairness and equity apply." (*CenterPoint, supra*, 157 Cal.App.4th at p. 1122.) On the facts established in this case, we see no basis to conclude that, as a matter of law, a corporation (IS West) may not be found to be a "mere continuation" of a separately operated line of business (ISI doing business as The Central Connection).

Defendants refer us to several cases they say support the proposition that a corporation like IS West "cannot be subjected to 'successor' liability where the seller [(ISI)] retained its separate corporate identity and continued to operate after the asset transfer." But this claim, too, presupposes the point we have just rejected: the assertion that there can never be successor liability as between a separately operated division of a company and a new corporation.

---

[6] Unlike, for example, *Gordon, supra*, 33 Cal.2d at page 521, the present case was not tried on an alter ego theory. In *Zuckerman*, the Supreme Court used the term "alter ego," but there is nothing in the opinion that suggests the court was referring to alter ego as the law has developed in the 81 years since *Zuckerman* was decided. (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538–539 [99 Cal.Rptr.2d 824] [factors in determining alter ego to enable the piercing of the corporate veil include: unity of interest, commingling of assets, use of the corporation as a shell, inadequacy of capitalization, disregard of corporate formalities, and the requisite inequitable result].) *Zuckerman* does not discuss any of these factors, and we conclude that the court there was using alter ego in a more colloquial sense: the same individual who had been doing business under a fictitious name was the person in control of the successor corporation of the same name.

*Gordon* did discuss alter ego in the more traditional sense (*Gordon, supra*, 33 Cal.2d at pp. 521–523), but in *Fotouhi* the Court of Appeal made it clear that its decision did not rest on alter ego principles (*Fotouhi, supra*, 197 Cal.App.4th at pp. 1143–1144).

We conclude the principle expressed in *Zuckerman, Gordon*, and *Fotouhi* does not turn on the presence or absence of alter ego liability. Instead, those cases stand for a different proposition: that successor liability need not always flow from corporation to corporation.

The equitable principles we have described compel rejection of that assertion under the circumstances of this case. Moreover, the facts in the cases defendants cite are decidedly different from the facts here.

Defendants first cite *Henkel Corp. v. Hartford Accident & Indemnity Co.* (2003) 29 Cal.4th 934 [129 Cal.Rptr.2d 828, 62 P.3d 69] (*Henkel*). In that case, the plaintiff, through a series of·agreements, acquired one of two lines of business (the metallic chemicals product line) from another corporation and assumed all related liabilities. The question was whether the plaintiff also acquired the benefits of certain insurance policies, covering injuries during the policy period, that had been assigned to it without the consent of the insurers. The court's answer was no. (*Id.* at p. 938.) The court explained that the plaintiff's claim to the seller's insurance protection as a matter of law "depend[ed] on a showing that [the plaintiff's] tort liability was imposed upon it by law," and the plaintiff failed to make that showing. (*Id.* at p. 941.) The court recited principles of successor liability (among other legal principles), explaining that successor liability was one of three situations "in which a buyer of corporate assets may be liable for the torts of its predecessor, notwithstanding the purchaser's failure to assume liability by contract . . . ." (*Ibid.*) But none of the circumstances for successor liability applied, including the "mere continuation" doctrine, "because that doctrine does not apply 'when recourse to the debtor corporation is available and the two corporations have separate identities.' " (*Ibid.*, quoting *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767, 778 [25 Cal.Rptr.2d 438, 863 P.2d 683] (*Beatrice*).) The court also observed there was no evidence the seller/predecessor "sold its metallic chemical business . . . to defraud its creditors." (*Henkel*, at pp. 941–942.)

■ The issue in *Henkel* was the right to insurance policy benefits, and the circumstances in *Henkel*—which included multiple layers of documented corporate transactions; the issue of liability imposed by operation of law for the torts of a predecessor; and a conclusion that the buyer was not liable by operation of law for injuries caused by defective products marketed by a predecessor—are far afield from the facts in this case. *Henkel* does not address the question whether, as a matter of law, there can never be successor liability in any context when a corporation takes over a specific line of business that was operated separately by another corporation. "[C]ases are not authority for propositions not considered." (*Fricker v. Uddo & Taormina Co.* (1957) 48 Cal.2d 696, 701 [312 P.2d 1085].)

The same is true of *Beatrice*, from which *Henkel* quoted the proposition that the "mere continuation" doctrine does not apply "when recourse to the debtor corporation is available and the two corporations have separate

identities." (*Beatrice, supra,* 6 Cal.4th at p. 778.)[7] *Beatrice* is a tax case involving a transaction between two corporations; the issue was "whether an assumption of liabilities constitutes consideration for a transfer of assets when the original obligor remains primarily liable." (*Id.* at pp. 770–771.) Beatrice Company created a subsidiary and then transferred all the assets of one of its divisions to that subsidiary. (*Id.* at p. 771.) By a written consent, the subsidiary issued and sold Beatrice stock in the subsidiary, in exchange for the division's assets and the subsidiary's assumption of the division's liabilities. (*Ibid.*) The court concluded that, while Beatrice remained primarily liable on debts and obligations assumed by its subsidiary, the subsidiary's assumption of liability for those debts and obligations was consideration, and the transaction was therefore a retail sale subject to payment of sales tax. (*Ibid.*)

In one of many contentions, Beatrice argued the subsidiary was obligated by law to assume the division's liabilities under *Ray v. Alad Corp., supra,* 19 Cal.3d 22, where the court held that a claim of strict tort liability presented "an exception to the general rules against imposition upon a successor corporation of its predecessor's liabilities . . . ." (*Id.* at p. 25.) The *Beatrice* court rejected Beatrice's proposition as an untenable reading of *Ray v. Alad Corp.,* and described the "generally applicable" rule of successor liability (*Beatrice, supra,* 6 Cal.4th at p. 778), including the obvious proposition that there was no merger or consolidation, "but the opposite, and [the subsidiary] is not a continuation of Beatrice. Beatrice continues to exist." (*Ibid.*) The court also rejected the "suggestion" that the subsidiary was liable as a mere continuation of Beatrice because one or more persons were officers, directors, or stockholders of both corporations, observing: "even when the same persons are officers or directors of the two corporations, liability is not imposed on the acquiring corporation when recourse to the debtor corporation is available and the two corporations have separate identities." (*Ibid.*) Thus, the court concluded that *Ray v. Alad Corp.* did not support "an argument that [the subsidiary] was otherwise [(other than by contract)] obligated to satisfy the Beatrice liabilities which [the subsidiary] assumed in the assumption agreement." (*Beatrice,* at p. 779.)

Again, we see no basis for concluding that the abstract statement of a legal point—in a case involving issues and facts entirely different from those in

---

[7] In the present case, recourse to ISI was not "available" under *Henkel,* even before ISI's bankruptcy, because it was IS West that would be marketing the Internet service to third persons and it was a percentage of the revenues that IS West generated that would belong to Cleveland. As we discuss in part 3, *post,* the jury reasonably found that there was a fiduciary relationship between the parties and they were not merely in the position of debtor and creditor. Fiduciary relationships were not present in *Henkel, Beatrice,* or *Ray v. Alad Corp.*

this case—can or should control the application of an equitable doctrine where "[c]onsiderations of fairness and equity apply" and "it is appropriate to examine successor liability issues on their own unique facts." (*CenterPoint, supra*, 157 Cal.App.4th at p. 1122; cf. *Rego v. ARC Water Treatment Co.* (3d Cir. 1999) 181 F.3d 396, 402, 403 (*Rego*) [successor liability in employment context; "we see no reason why successor liability must be imposed on an all-or-nothing basis with respect to a predecessor's creditors"; "we emphasize that each successor liability 'case must be determined on its own facts . . .' "].) As in *Henkel*, nothing in *Beatrice* suggests that, as a matter of law, principles of successor liability may not be applied in the context of an unincorporated separate line of business.

Defendants also contend that inadequate consideration is an "essential element" of the "mere continuation" basis for successor liability, and argue there was no evidence of inadequate consideration. Some Court of Appeal cases have stated that inadequate consideration is essential, but others, including the Supreme Court in *Ray v. Alad Corp.*, have suggested otherwise.

In *Maloney v. American Pharmaceutical Co.* (1988) 207 Cal.App.3d 282 [255 Cal.Rptr. 1] (*Maloney*), the court stated that, in the absence of the "essential ingredient of inadequate consideration," the second company was not a mere continuation of the first, "such that liability for [the first corporation's] alleged negligent manufacture of [a prescription drug] might attach" to the second corporation. (*Id.* at p. 289.) In *Maloney*, the court found "two characteristics which can contribute to a finding that one corporation [was] a mere continuation of the other." (*Id.* at p. 288.) These were a holding out as a continuation in a letter to prospective customers, and that " 'one or more persons were officers, directors, or stockholders of both corporations.' " (*Id.* at p. 289, quoting *Ray v. Alad Corp., supra*, 19 Cal.3d at p. 29.) However, said the court, the plaintiffs "present[ed] no argument as to how the presence of these two characteristics can make up for the absence of the essential ingredient of inadequate consideration." (*Maloney*, at p. 289.)

But the *Maloney* court also observed that "several other characteristics of a mere continuation [were] missing in the present case." (*Maloney, supra*, 207 Cal.App.3d at p. 288.) The second corporation only bought 10 percent of the first corporation's assets (including use of its name, its goodwill, and patents and trademarks limited to nonprescription drugs); it bought those assets from a bank which was liquidating the first corporation's assets; it did not make or sell prescription drugs, including the drug in question; and the two corporations had only a single officer in common. (*Id.* at pp. 285–286.) In short, it is hard to see how the mere continuation doctrine could be applied on these facts, whether the consideration was adequate or not.

The Supreme Court has not addressed the question whether inadequate consideration is essential to a finding that one company is a mere continuation of another, but *Ray v. Alad Corp.*, reviewing successor liability principles, suggested that it is not, observing that the cases have imposed such liability "only upon a showing of *one or both*" of the factual elements of inadequate consideration and common officers, directors or stockholders. (*Ray v. Alad Corp., supra*, 19 Cal.3d at p. 29, italics added.)

■ In our view, the cases simply demonstrate the factual and equitable nature of the successor liability doctrine; it is probable that no single factual element, standing alone, would establish or negate successor liability. (See *Beatrice, supra*, 6 Cal.4th at p. 778 [same officers and directors alone was insufficient when the two corporations had separate identities and "recourse to the debtor corporation"].) The significant principle is that " 'if a corporation organizes another corporation with practically the same shareholders and directors, transfers all the assets but does not pay all the first corporation's debts, and continues to carry on the same business, the separate entities may be disregarded and the new corporation held liable for the obligations of the old.' " (*McClellan, supra*, 89 Cal.App.4th at p. 753.) Whether that has happened depends on all the facts and circumstances. (See *CenterPoint, supra*, 157 Cal.App.4th at p. 1122, quoting *Rego, supra*, 181 F.3d at p. 403 [" 'each successor liability "case must be determined on its own facts . . . ." [Citation.]' "].) Consistent with these principles, we decline to find that a plaintiff must necessarily establish the inadequacy of the consideration purportedly paid for the transferred assets.

■ As a final point on this topic, we note that the jury's verdict is also sustainable, as a legal matter, on an additional ground upon which successor liability may be based. A corporation that purchases the assets of another assumes the first corporation's liabilities when "the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp., supra*, 19 Cal.3d at p. 28.) While, as defendants point out, Cleveland did not expressly proceed on this theory at trial, and the jury was not instructed on this principle of successor liability, the jury imposed punitive damages on both Johnson and IS West, finding that they "knowingly act[ed] against [Cleveland's] interests by failing to disclose material facts to [Cleveland]," and that they both acted "with malice, oppression, or fraud." There was substantial evidence supporting those findings, from which the necessary conclusion to be drawn is that Johnson transferred The Central Connection's assets to IS West and hid the formation of IS West from Cleveland for the purpose of avoiding liability under the contract with Cleveland. Consequently, successor liability would be appropriate on this ground as well.

## 2. *The Substantial Evidence Claims—Breach of Contract—Ratification*

The jury also found a separate and independent basis for Cleveland's breach of contract claim: that IS West ratified the preincorporation contract between Cleveland and ISI. Defendants contend there was no substantial evidence that IS West ratified the contract. We again disagree.

The deficiency in the evidence of ratification, defendants say, is that "there is no evidence that [IS West], incorporated in 1996, knew about ISI's 1995 contract" and "no evidence that [Cleveland's] contract was entered as a liability on the books of [IS West]." Specifically, they point out there is no evidence that Rubottom, one of the four founding shareholders and officers of IS West, knew about the contract (or that Drew Kaplan, who joined IS West in 1997, knew about it). Only Johnson, Spitler, and Hastings knew about it, and they were all "interested directors" whose knowledge, defendants claim, cannot be imputed to IS West. For this point, defendants rely on language from *Commercial Lumber Co. v. Ukiah Lumber Mills* (1949) 94 Cal.App.2d 215, 220–221 [210 P.2d 276] (*Commercial Lumber*), but their reliance is misplaced.

*Commercial Lumber*, after observing that ratification "will not be presumed unless the corporation had actual knowledge of the specific contract out of which the benefits arose," said this: "The knowledge of a director who is directly interested in the contract is insufficient to charge the corporation and knowledge of a promoter who subsequently becomes a director cannot be imputed to the corporation." (*Commercial Lumber, supra*, 94 Cal.App.2d at pp. 220–221.) Defendants assert this principle applies here, because Hastings, Spitler, and Johnson were *all* interested directors and promoters—they were "directly involved with [Cleveland's] agreement as the officers and directors of ISI."

We decline to apply the *Commercial Lumber* principle on the facts of this case, because this case does not involve the sort of self-dealing that appears in *Commercial Lumber*, and indeed its application here would eviscerate the principle of ratification.

In *Commercial Lumber*, the plaintiff loaned money to the defendant, with the understanding that the defendant was to form a corporation that would erect a sawmill and ship lumber to the plaintiff; the loan was made to give the defendant capital for the project, and would be repaid by credit deductions on lumber shipped to the plaintiff. (*Commercial Lumber, supra*, 94 Cal.App.2d at p. 217.) The corporation was formed, with the defendant and others as

directors and officers, but the loan from the plaintiff was never entered on the books or records of the corporation. It was undisputed that the defendant "took pains to conceal the transaction" from the new officers of the corporation. (*Id.* at p. 218.) The defendant used the loan funds to buy timber and other assets he turned over to the corporation in return for shares of stock in the corporation. (*Id.* at p. 220.) In the lawsuit that ensued after all this was discovered, the plaintiff argued there was an implied ratification of the loan contract by the corporation. The court rejected the claim as untenable, stating: "[E]ven had the corporation received the benefits of the contract, ratification will not be presumed unless the corporation had actual knowledge of the specific contract out of which the benefits arose." (*Ibid.*) The only person with actual knowledge of the transaction was the defendant, and his knowledge could not be imputed to the corporation: "The knowledge of a director who is directly interested in the contract is insufficient to charge the corporation and knowledge of a promoter who subsequently becomes a director cannot be imputed to the corporation." (*Id.* at pp. 220–221.)

In short, the defendant in *Commercial Lumber* was "interested" in the preincorporation contract, which was a loan "upon [the defendant's] credit" and "signed by him individually" (*Commercial Lumber, supra,* 94 Cal.App.2d at p. 220), from which he personally derived the benefit (receiving stock in the corporation in return for the assets he contributed from the loan proceeds), and which he actively hid from the officers of the corporation. It is entirely unsurprising for the court to conclude that the defendant's knowledge of the preincorporation contract cannot be imputed to the corporation.

But here, the circumstances are entirely different. Spitler and Hastings (and Johnson, for that matter) may be said to have been "interested" in the Cleveland contract only in an indirect sense, as officers and directors of ISI, not as individuals. And—unlike the defendant in *Commercial Lumber*—they received no personal benefit from the contract. There was no "self-dealing"; they were dealing on behalf of ISI. Further, it strikes us as absurd to claim, as defendants do, that there can be no ratification of a preincorporation contract simply because *one* of the four founding shareholders, officers and directors of the new corporation—Rubottom, a 25 percent shareholder who, by his own admission, never attended directors meetings and "had absolutely no say in the management of the company"—did not know about it (or at least there was no evidence he knew about it).

On the contrary, the circumstances here virtually mandate a recognition that IS West ratified the Cleveland agreement. "A ratification can be made . . . by accepting or retaining the benefit of the act, with notice thereof." (Civ.

Code, § 2310.) There can be no dispute that IS West benefitted from Cleveland's investment in The Central Connection. Virtually everyone at IS West when it was incorporated in 1996—three-quarters of the board of directors, all except Rubottom—had notice of the Cleveland arrangement, and so did Jerry Smith, who was attorney for both ISI and IS West. None of them was "directly interested in the contract" within the meaning of *Commercial Lumber*, and their knowledge as admitted officers and agents of IS West is necessarily imputed to IS West. Any other conclusion would turn the principle of ratification on its head.

In a related argument, defendants contend that the jury instruction on ratification was "seriously flawed" and "prejudicial because it allowed the jury to find that [IS West] ratified the ISI contract without finding that ISI and Johnson had entered into the contract for the benefit of [IS West] and without finding that the uninterested directors knowingly approved the contract." This is in substance just another version of the argument we have just rejected. Moreover, the jury was instructed on ratification under CACI No. 3710.[8] Defendants do not cite to the record showing any objection to this instruction, or that they proffered a different instruction that was rejected, and we have found none. Indeed, defense counsel said, "We are fine with the straight CACI instruction," and Cleveland's counsel said, "We'll just accept the CACI, Your Honor, to streamline the process." Accordingly, defendants' argument is meritless.

### 3. *The Substantial Evidence Claims—Breach of Fiduciary Duty*

The jury found that ISI and Johnson owed a fiduciary duty to Cleveland as promoters, that IS West owed a fiduciary duty to Cleveland, that Johnson owed a fiduciary duty to Cleveland as an officer and director of IS West, and that both defendants knowingly acted against Cleveland's interests by failing to disclose material facts to Cleveland.

The jury's findings that Johnson owed a fiduciary duty to Cleveland were based on instructions that a promoter occupies a special fiduciary relationship to those whom he induces to invest, "has a duty to act in the highest good faith towards the investors, shareholders or subscribers," and "must not use

---

[8] The instruction explained that Cleveland claimed IS West was responsible under the contract because it "approved the conduct of ISI and Johnson after it occurred" and that the jury "must decide whether IS West approved their conduct." Cleveland was required to prove that "ISI and/or Johnson intended to act and acted for the benefit of IS West with respect to The Central Connection"; that IS West "became aware of the conduct of these parties after it occurred"; and that IS West approved the conduct. Further, "Approval can be shown through words, or it can be inferred from conduct. Approval can be inferred if a corporation voluntarily keeps the benefits of its representative's conduct after it learns of the conduct."

the position to gain any advantage over the investor, shareholder or subscriber . . . ." Similarly, the jury was instructed that a corporation, through its officers and directors, "owes fiduciary duties to its investors, shareholders or subscribers," and "must act in the highest good faith towards its investors, shareholders or subscribers and must make full disclosure of material facts." Any material concealment, the jury was told, would amount to fraud sufficient to entitle the injured party to an action.

Defendants objected to the instructions, asserting that neither promoters nor corporations owe a fiduciary duty to their investors, but only to shareholders or subscribers. They renew this contention on appeal, contending that Cleveland was neither a shareholder nor a subscriber, so they cannot be liable for breach of fiduciary duty, and thus there was no substantial evidence to support the jury's breach of fiduciary duty finding.[9]

We conclude, under the circumstances here, that Johnson and IS West did indeed owe a fiduciary duty to Cleveland as a preincorporation investor in The Central Connection. Cleveland's investment, which gave him rights to 5 percent of the enterprise's gross profits ad infinitum, is akin to the ownership interest of a shareholder, not, as defendants assert, to a "debtor/creditor relationship."

 a. *The law of fiduciary duty*

We begin with recognized principles of fiduciary duty and related points established by the cases.

■ First, a fiduciary relationship is " 'any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . .' " (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220].)

Second, " '[b]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' [Citation.]" (*City of Hope National Medical Center v.*

---

[9] Defendants separately argue, but on the same basis, that the trial court's instructions on fiduciary duty were erroneous.

*Genentech, Inc.* (2008) 43 Cal.4th 375, 386 [75 Cal.Rptr.3d 333, 181 P.3d 142] (*City of Hope*).) In this case, the question is whether the relationship between Johnson as promoter and Cleveland as investor is " 'a relationship which imposes that undertaking as a matter of law.' " (*Ibid.*) While Cleveland claims that we can infer a "voluntary undertaking [by Johnson] to act on behalf of and for [Cleveland's] benefit," the jury was not instructed on and did not decide that issue, so, as in *City of Hope*, there is no factual basis showing Johnson knowingly undertook the obligations of a fiduciary. (*Ibid.*)

Third, examples of relationships that impose a fiduciary obligation to act on behalf of and for the benefit of another are "a joint venture, a partnership, or an agency." (*City of Hope, supra*, 43 Cal.4th at p. 386.) But, "[t]hose categories are merely illustrative of fiduciary relationships in which fiduciary duties are imposed by law." (*Ibid.*)

Fourth, it has long been held that "[p]romoters are fiduciaries." (9 Witkin, Summary of Cal. Law, *supra*, Corporations, § 53, p. 829.) " 'Any persons who subscribe for stock have a right to do so upon the assumption that the promoters are using their knowledge, skill, and ability for the benefit of the company. It is, therefore, clear on principle that promoters, under the circumstances just stated, do occupy a position of trust and confidence, and it devolves upon them to make full disclosure. . . . So it has been said . . . ". . . that where persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation to each other, and to all others who may subsequently become members or subscribers . . . ." ' " (*California-Calaveras Min. Co. v. Walls* (1915) 170 Cal. 285, 296 [149 P. 595] (*California-Calaveras*); see *Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 322 [267 Cal.Rptr. 5] ["A promoter or insider, or a seller of a limited partnership interest, owes a fiduciary duty to the prospective purchaser of such an interest."].) The rules imposing a fiduciary duty apply "[w]hether the seller be broker, promoter, partner, corporate agent, insider, or limited partnership syndicator . . . ." (*Eisenbaum*, at p. 323.) *Eisenbaum* explained that the relationship " 'between a corporate insider and the stockholders of his corporation gives rise to a disclosure obligation' " and " '[t]he duty arose from (i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure.' [Citation.]" (*Id.* at p. 324.)

Fifth, several cases relied on by defendants discuss contractual relationships that do *not* result in the creation of a fiduciary relationship by operation of law. Thus:

In *City of Hope*, the court held the trial court erred in instructing the jury that a fiduciary relationship *necessarily* arises "when a person entrusts a

secret idea or device to another under an arrangement whereby the other party agrees to develop, patent and commercially exploit the idea in return for royalties." (*City of Hope, supra*, 43 Cal.4th at p. 387.) The court rejected that proposition as overbroad. Among other things, the court explained:

——The contract in question there was between two sophisticated parties represented by counsel throughout the contractual negotiations.

——The contract specified that the parties' relationship was "not one involving agency, joint venture, or partnership, which are categories in which fiduciary obligations are imposed by operation of law . . . , but that City of Hope was to be an independent contractor." (*City of Hope, supra*, 43 Cal.4th at p. 387, citations omitted.)

——The plaintiff City of Hope was "vulnerable because it had to rely on [the defendant's] superior ability in obtaining patents and in marketing products," but "not to the extent that would necessarily warrant recognition of a fiduciary duty," and the plaintiff had not made a showing of vulnerability substantial enough to raise equitable concerns. (*City of Hope, supra*, 43 Cal.4th at p. 389.)

——Every contract requires one party " 'to repose an element of trust and confidence in the other to perform,' " and one party's ability to exploit a disparity in bargaining power "does not necessarily create a fiduciary relationship." (*City of Hope, supra*, 43 Cal.4th at p. 389.)

——While the secrecy of information provided to the other party (the plaintiff's scientific discovery) "may be considered by the trier of fact in deciding whether a fiduciary relationship exists, . . . it does not compel the imposition of fiduciary duties by operation of law." (*City of Hope, supra*, 43 Cal.4th at p. 391.)

So, the court held because "fiduciary duties do not necessarily arise from this type of relationship," the plaintiff's only theory at trial—that "the nature of its contractual relationship with [the defendant] necessarily imposed fiduciary obligations on [the defendant]"—was legally invalid. (*City of Hope, supra*, 43 Cal.4th at pp. 392, 390.)

In *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25 [130 Cal.Rptr.2d 860] (*Wolf*), the trial court had sustained a demurrer to a breach of fiduciary cause of action filed by an author against a production company. The author claimed that the production company had failed to properly exploit the

author's novel. On a writ petition, the appellate court held (and, later in *City of Hope*, the Supreme Court agreed) "that fiduciary obligations are not necessarily created when one party entrusts valuable intellectual property to another for commercial development in exchange for the payment of compensation contingent on commercial success." (*City of Hope, supra*, 43 Cal.4th at p. 391.) In *Wolf*, the author of a novel entered into a contract with Disney assigning the rights to the novel and its characters in exchange for a stated, fixed compensation; a percentage of net profits from a motion picture based on the novel; and "additional, contingent compensation in the amount of 5 percent of any future gross receipts Disney earned from merchandising or other exploitation" of the characters. (*Wolf, supra*, at pp. 27–28.) However, Disney was not under any obligation to exercise any of the rights granted to it under the agreement, and could assign or license those rights as it saw fit. (*Ibid.*)

In *Wolf*, the Court of Appeal held that "a contingent entitlement to future compensation within the exclusive control of one party does not make that party a fiduciary in the absence of other indicia of a confidential relationship . . . ." (*Wolf, supra*, 107 Cal.App.4th at p. 27.) In *Wolf*, there were no allegations showing any " 'traditionally recognized' " fiduciary relationship; instead the plaintiff contended that his right to contingent compensation required him to repose " 'trust and confidence' " in Disney to account for the revenues received, and because the revenues and their sources were in the exclusive knowledge and control of Disney, the relationship was confidential in nature and necessarily imposed a fiduciary duty on Disney. (*Id.* at p. 30.) The court rejected this notion, stating, among other points:

—The contractual right to contingent compensation in the control of another "has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist." (*Wolf, supra*, 107 Cal.App.4th at pp. 30–31, citations omitted.) ·

—The profit sharing aspect of an agreement alone does not give rise to a fiduciary relationship. (*Wolf, supra*, 107 Cal.App.4th at pp. 31–32.)

—The plaintiff's complaint did not allege "a relationship 'akin' to a joint enterprise," but to the contrary, the agreement "created a debtor/creditor relationship, expressly providing that in exchange for compensation, both certain and contingent, Disney, as the new owner of the rights, could exploit those rights or not exploit them as it saw fit," and was under no obligation to maximize profits. (*Wolf, supra*, 107 Cal.App.4th at p. 32.) "Instead, . . . the contract plainly allowed an opportunity for nonmutual profit that is absent in fiduciary relationships." (*Id.* at p. 33.)

Finally, in *Pittelman v. Pearce* (1992) 6 Cal.App.4th 1436 [8 Cal.Rptr.2d 359] (*Pittelman*), the court held that a corporation and its directors do not owe a fiduciary duty to the corporation's debenture holders. (*Id.* at p. 1438.) The court adhered to views expressed in earlier cases that debenture holders, even those holding convertible debentures, " 'remain corporate creditors only . . . .' " (*Id.* at p. 1443.) The court stated that "[a] debenture holder's legitimate business expectations 'are only that the debt, with interest, will be paid when due' " (*ibid.*) and "[a] bondholder is a creditor whose remedies are necessarily limited to an action for breach of the indenture agreement" (*id.* at p. 1447). Further, " 'a convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties. [Citation.]' [Citation.]" (*Id.* at p. 1446, fn. 14.)

The *Pittelman* court also observed there was a "fundamental conflict" between shareholders and bondholders, and that circumstances could arise under which directors would be "hard pressed to discharge a fiduciary duty to both groups." (*Pittelman, supra,* 6 Cal.App.4th at p. 1445.) "The potential for conflict exists because bondholders have prior but fixed claims on a firm's assets, while shareholders have limited liability for the firm's debts and unlimited claims on a firm's assets." (*Id.* at p. 1444.)

### b. *This case*

Here, defendants argue a promoter's fiduciary duty is confined to stockholders—the "members or subscribers" mentioned in *California-Calaveras*—but not to "investors." Relying on *City of Hope* and *Wolf,* defendants say Cleveland "had a contingent right to share in a percentage of the revenues," and the relationship was "thus more akin to a debtor/creditor relationship, which does not create a fiduciary duty."

We disagree, both on the facts and on the law, and hold that in this case, there was substantial evidence that the promoter (Johnson) and the corporation (IS West, acting through Johnson as a director) owed a fiduciary duty to Cleveland as an investor. We do not say that, under all circumstances, all corporations or promoters owe fiduciary duties to all "investors." The word "investor" is used in common parlance to include holders of debt as well as equity in a corporation. But in this case, the terms of the investment were clearly defined, and Cleveland's position is indistinguishable in any pertinent way from the position of a stockholder, or a "subscriber or member" (*California-Calaveras, supra,* 170 Cal. at p. 296) of the corporation ultimately formed. Cleveland provided the seed money for the corporation, and in return he was to share in the net cash receipts and later in the gross profits

of the enterprise, if there were any. That he did not receive shares of stock or concomitant voting rights does not, it seems to us, detract from what is effectively an ownership interest in the enterprise. We see no reason why a promoter, who undoubtedly has a fiduciary duty to investors who later receive stock certificates entitling them to share in the profits of the enterprise, should not likewise have a fiduciary duty to initial investors who do not receive stock but are entitled by contract to share in the profits of the enterprise. Both have the equivalent of an equity position in the company—in effect, "limited liability for the firm's debts and unlimited claims on a firm's assets." (*Pittelman, supra*, 6 Cal.App.4th at p. 1444.)

Defendants' reliance on *City of Hope* and *Wolf*—their contention that, as in those cases, Cleveland "had a contingent right to share in a percentage of the revenues," and this was "more akin to a debtor/creditor relationship"—is misplaced. First, the jury found that Cleveland's $75,000 was an investment, not a loan, expressly rejecting defendants' claim that the $75,000 was a loan and was usurious.[10] This finding negates a "debtor/creditor relationship." Second, this case is nothing like *City of Hope* or *Wolf*. There was a preincorporation investment contract here, not a contract for royalties in exchange for patenting and developing a secret scientific discovery (*City of Hope*), and not a "contingent entitlement to future compensation within the exclusive control of one party" (*Wolf, supra*, 107 Cal.App.4th at p. 27). The "contingent compensation" in *Wolf* was contingent on Disney's discretionary decision to exploit the rights it bought from Wolf. Cleveland's right to compensation is "contingent" only in the same way a shareholder's dividends are contingent: on the enterprise making a profit.

Nor, as defendants argue, are investors like Cleveland "similar to creditors or bond holders of a corporation" to whom no fiduciary duty is owed, as established in *Pittelman*. This is simply another version of defendants' claim that the $75,000 was a loan, a claim rejected by the jury. And *Pittelman* is clear in pointing out that bond holders *are* creditors, and *only* creditors, with "fixed claims on a firm's assets" (*Pittelman, supra*, 6 Cal.App.4th at p. 1444), quite unlike Cleveland's entitlement to share in the profits of the enterprise. (See *id.* at p. 1446, fn. 14.)

Finally, we cannot help noting that, while the jury was not instructed on other theories of fiduciary duty, the arrangements with Cleveland were very

---

[10] The jury was instructed that an "investment contract" was "a contract or a transaction in which a person entrusts money to another, with the expectation of deriving a profit or some financial benefit from a business enterprise, the failure or success of which is dependent upon the managerial efforts of other persons." The jury was also instructed on the elements of a loan and on the elements of usury, as defendants took the position at trial that Cleveland's $75,000 was a loan, not an investment, and that the 5 percent of gross receipts was usurious.

much in the nature of a limited partnership (where the limited partner provides capital but does not take part in running the enterprise), a relationship which as a matter of law gives rise to fiduciary duties on the part of those managing the enterprise. (*Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 402 [149 Cal.Rptr. 626].)

In sum, we see no basis upon which we may, as a matter of law, interfere with the jury's finding that Johnson and IS West owed fiduciary duties to Cleveland as a preincorporation investor—the indistinguishable factual equivalent of a shareholder or member or subscriber—in the circumstances of this case.

### 4. *Other Claims—Reduction in the Judgment*

The jury found that Cleveland's damages for the breach of contract were $3,826,000. Defendants argue that the damages awarded were excessive because they exceeded the amount permitted by the contract, which called for Cleveland to receive 100 percent of the net cash receipts "from the InterNet project" until the capital invested was recouped, and thereafter to receive "5% of gross receipts from the InterNet project." Defendants argue their accounting expert testified without contradiction that "five percent of all past internet access gross receipts was $1.8 million," and that instead the jury awarded an amount representing "five percent of *all* [of IS West's] past gross receipts from all services." Therefore, they say, the judgment should be reduced by $1,350,000, with a corresponding decrease in interest.

We see no basis for a reduction in the judgment. First, when defendants moved for a new trial on the ground of excessive damages, they did not proffer this asserted defect in the verdict, arguing only that punitive damages were improper and that breach of contract damages could not be awarded against Johnson, but only against IS West. Second, the amount of damages was for the jury to decide, and there was plenty of evidence that "the InterNet project" *was* The Central Connection, later incorporated as IS West. Even IS West's Drew Kaplan admitted that "the seeds of what [IS West] does today, connectivity and colo [collocation services], were there in April of 1997" when he arrived at IS West. We are not at liberty to decide that the contract really meant only "internet access" gross receipts, not gross receipts from The Central Connection, however its business might evolve. That question was for the jury.

### 5. *Other Claims—Punitive Damages*

Defendants contend the jury's award of punitive damages cannot stand, first because there was insufficient evidence to support the findings of breach

of fiduciary duty, and second because the jury awarded no damages for the breach of fiduciary duty. We have rejected defendants' first claim in part 3, *ante*, and the second claim is equally without merit.

As already described, after the jury awarded zero damages for the breach of fiduciary duty (and at the same time found both defendants acted with malice, oppression, or fraud), and before the second phase of the trial, the court submitted supplemental questions and the jury answered them. The answers indicated the award of zero damages was *not* because the jury thought there were no damages, but because the damages were duplicative of the damages already awarded for breach of contract. Defendants assert, without citation of authority or further analysis, that the "absence of a damages award for a tort cause of action was not cured by the trial court's inadequate efforts to 'clarify' the jury's verdict on this question." We see nothing inadequate or otherwise improper about the court's questions, and nothing ambiguous about the jury's answers. Consequently, the jury was at liberty to award punitive damages in connection with the defendants' breach of fiduciary duty.

### 6. *Other Claims—Jury Instructions*

Defendants contend in the alternative that, if they are not entitled to judgment in their favor, they are entitled to a new trial because of instructional error. In addition to challenging the instructions on ratification and breach of fiduciary duty (disposed of in pts. 2 & 3, *ante*), they challenge the successor liability instruction, contending it misinformed the jury of the findings necessary for successor liability. The jury was instructed as follows:

"A corporation like IS West is liable for the debts, liabilities and obligations of ISI doing business as the Central Connection if you find that it is a 'mere continuation' of the latter. To determine whether IS West is a 'mere continuation' of ISI doing business as the Central Connection, you may consider the following factors:

"(i) ISI transferred its assets to IS West; and

"(ii) ISI did not receive adequate consideration in return for all of its assets or make available adequate consideration for meeting the claims of ISI's unsecured creditors; and

"(iii) IS West and ISI had similar officers, directors, owners and stockholders;

"(iv) IS West and ISI had the same business, practices, customers and policies; and

"(v) IS West failed to pay ISI's debts despite a transfer to it of all of ISI's assets."[11]

Defendants contend the "most egregious error" in the instruction was that the five factors are presented "as if they were all proven statements of fact, which most likely misled the jury into believing that these facts had been established, when they had not." We reject this contention, as no reasonable juror, having heard the extensive evidence and arguments presented at the trial, would have assumed these points were facts to be taken as true. If they were, there would have been no reason to give the instruction in the first place. Moreover, the jury was also instructed that, to recover damages for breach of contract, Cleveland "must prove [¶] [t]hat IS West is the continuation of ISI doing business as the Central Connection and succeeded to all of its liabilities and obligations . . . ." There was no error.[12]

### 7. Other Claims—The Special Verdict

Finally, defendants claim they are entitled to a new trial because the special verdict findings were inconsistent. They say that the theory of "mere continuation successor liability for the obligations of a predecessor is inconsistent with the theory of ratification of a pre-incorporation agreement." We cannot, however, see any inconsistency. The jury found that ISI—defined as "Interactive Strategies, Inc. dba The Central Connection"—entered into a contract for Cleveland to provide funds to develop the Internet project; that ISI and Johnson were promoters; that ISI (doing business as The Central Connection) later incorporated into IS West and was its successor; and that IS West ratified the preincorporation contract. We see no reason why the jury's answers on successor liability and ratification cannot both be true.

---

[11] The instruction continued: "A corporation which is a mere continuation of a prior corporation or which is formed by consolidation or merger, is answerable for the debts and liabilities of the prior corporation, whether they arise in contract or in tort. [¶] If Plaintiffs prove that IS West is a 'mere continuation' of ISI doing business as the Central Connection, then it is answerable for the debts and liabilities of the latter, whether they are the result of the latter's breach of contract, fraud, breach of fiduciary duty or money had and received."

[12] Defendants also argue the instruction was erroneous because "the so-called 'factors' are not factors but instead essential elements of successor liability." They complain that, for example, the instruction says ISI "transferred its assets to [IS West]," whereas "a transfer of the predecessor's principal assets—not just any assets—is a threshold determination for successor liability, not a mere factor." This is simply a repackaging of an argument we have already rejected—that there can be no successor liability as between a separate line of business of one corporation and another corporation. (See pt. 1, *ante*.) Here, there was no dispute that all the assets of The Central Connection were in fact transferred to IS West. We have likewise already rejected (pt. 1, *ante*) defendants' similar claim that inadequate consideration and continuity of officers and directors are both essential requirements, not factors. (See *CenterPoint, supra*, 157 Cal.App.4th at p. 1122, quoting *Rego, supra*, 181 F.3d at p. 403 [" 'each successor liability "case must be determined on its own facts" ' "].)

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

Flier, J., and Grimes, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 23, 2013, S206752.