Filed 3/4/13  Marathon Funding v. Paramount Pictures CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARATHON FUNDING, LLC, | B240723 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC436412) |
| v. | |
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mark Mooney, Judge.  Affirmed.

Hillel Chodos for Plaintiff and Appellant.

Kendall Brill & Kleiger, Richard B. Kendall and Nicholas F. Daum for Defendant and Respondent.

_____

Plaintiff Marathon Funding, LLC, appeals from the judgment entered for defendant Paramount Pictures Corporation in this action for breach of fiduciary duty. The claim arose from a contract by which Marathon invested in several motion pictures produced by Paramount. Because the trial court correctly determined that the parties' agreement did not give rise to any fiduciary duties, we affirm the judgment. We also affirm the postjudgment order awarding Paramount attorney's fees.

## FACTS AND PROCEDURAL HISTORY

In December 2006, Marathon Funding, LLC, agreed to invest in a slate of 14 motion pictures to be produced and distributed by Paramount Pictures Corporation, including what would become the Oscar winner for best picture in 2007 – "No Country For Old Men" – which starred Tommy Lee Jones and Javier Bardem. Pursuant to that agreement, Paramount issued an accounting statement to Marathon in late 2009 that deducted a little more than $2 million from Marathon's account. Marathon later determined that Paramount did so to cover a portion of a $15 million payment Paramount made to Jones due to a drafting error Paramount made in its contract with Jones.

Marathon sued Paramount for breach of fiduciary duty, contending that Paramount should not have charged Marathon for Paramount's error. The trial court granted Paramount's motion to hold a bench trial, not a jury trial, finding that this was the proper course because the gist of Marathon's action was equitable in nature. The parties stipulated that no extrinsic evidence would be introduced concerning the formation or interpretation of the investment agreement, and that no extrinsic evidence would be introduced concerning their conduct under that agreement except as to the accounting charges that were made. In addition, Marathon stipulated to the facts it characterized as undisputed in response to Paramount's earlier unsuccessful motion for summary judgment.

The facts showed that Paramount and Marathon signed a "Multi-Picture Investment Agreement" dated December 15, 2006, that called for Marathon to invest in a

2

slate of Paramount motion pictures, including "No Country For Old Men".[1]  Marathon is a Delaware limited liability corporation with its principal place of business in New York State, and was formed by Morgan Stanley Asset Funding, LLC, a subsidiary of the international investment bank Morgan Stanley.  Morgan Stanley put up $150 million through a separate agency it created to finance Marathon's investment.  Morgan Stanley also acted as the exclusive agent for refinancing of that credit by allowing other investors, including financial institutions and hedge funds, to invest in Marathon's right to receive profit payments under the investment agreement.

Under the investment agreement, Marathon received a 50 percent share of Paramount's copyright interest in each of the movies covered by the agreement (the covered pictures).  Because other financing was obtained for No Country, Marathon and Paramount each ended up with a 25 percent share of that film's copyright while the remaining 50 percent went to the new investor, Disney/Miramax.  Marathon's "Investment Price" in each movie was based on its proportional copyright share of the movie's estimated production costs.  In exchange, Marathon would receive the same proportional percentage of each movie's net receipts.  Paramount was responsible for all the marketing and distribution costs of the covered pictures, which, because of their low-budget nature, greatly exceeded the actual production costs.  Paramount would advance all direct costs for the movies and, "[a]s between Paramount and Investor, Paramount shall control all decisions (i.e., business, creative, or otherwise) relating to the development and production of each Covered Picture as well as the decisions whether to pursue and consummate any Co-Financing Transaction, and Investor shall have no consultation or approval rights thereto."

The term "net receipts" was contractually defined to mean the gross receipts from the distribution and exhibition of a movie, minus deductions for certain expenses and fees, including third party profit participation payments that might be owed to the

---

[1]     Some of the movies, like "No Country For Old Men," had already been made, while others had not.  For ease of reference we will refer to that motion picture as No Country.

3

director, producers, or certain actors.[2]  Jones's contract for No Country included a type of third party profit clause known as a box office bonus which is at the heart of the present litigation.  So too did the contracts of directors Joel and Ethan Coen and producer Scott Rudin.  These talent contracts were negotiated in early 2006, well before the investment agreement was signed.  Production of No Country had also concluded before the investment agreement was signed.

The box office bonuses negotiated for Jones, Rudin, and the Coen Brothers provided that each would receive fixed bonuses when either the domestic box office receipts reached certain levels, or when worldwide box office receipts reached twice the domestic level.  Paramount hired outside legal counsel to prepare agreements that conformed with the negotiated terms, as reflected in deal memos provided by Paramount's in-house negotiator.  However, the lawyer mistakenly drafted the agreements to provide that bonuses would be paid once worldwide box office receipts, when multiplied by two, reached the levels prescribed for domestic box office bonuses.  As a result, the contracts between Paramount on the one hand, and Jones, Rudin, and the Coen Brothers on the other hand, provided for an unintended increase in their bonus compensation.[3]

Outside counsel discovered her mistake in June 2006 but apparently did not notify Paramount.  Although drafts of the agreements were distributed to various departments within Paramount, including to the legal department and the contract negotiator, a highly-placed Paramount legal executive testified that it was not Paramount's policy to review such drafts to be sure they were consistent with the negotiated terms.  Instead, Paramount relied on its outside counsel, whom it had used without problems before.  According to

---

[2]  The formula was more complicated than this, and included something called an Investor Corridor Payment, which was a percentage of gross receipts that would be paid as an advance against net receipts.  The full details of this formula are irrelevant to the issues on appeal.

[3]  The attorney made another error that inflated their share of home video revenues, but that error did not affect Marathon and is therefore not relevant to the issues on appeal.

4

Paramount, it did not discover the errors until 2008, at about the same time as did one of Rudin's attorneys.

Once Paramount learned of the error in the box office bonus provision, it contacted Rudin, Jones, and the Coen Brothers. Rudin and the Coen Brothers acknowledged that the provision as it appeared in the contract did not reflect the terms they had in fact negotiated and agreed to reform their contracts accordingly. Jones refused to do so, and the dispute was eventually heard by a panel of arbitrators, who ruled 2-1 in Jones's favor.

Under the higher, erroneous, formula, Jones was entitled to a box office bonus of $17.5 million. According to Carmen Desiderio, Paramount's senior vice president in charge of contract accounting, if the correct formula had been applied, Jones would have been entitled to a box office bonus of just under $5 million as of October 2011. That figure would have increased over time, however, Desiderio testified. Using Paramount's standard accounting methodology, Desiderio testified that Jones would most likely have earned an additional $1.7 million in box office bonus compensation over the movie's 10-year life cycle. Because Paramount had already paid Jones $2.5 million of his box office bonus, Paramount paid him another $15 million to make up the difference. That figure capped the total amount of such compensation Jones could receive, however. As a result, Jones was compensated more than $10 million above what he would have received absent the contract drafting error.

After obtaining a settlement of $2.75 million from its outside counsel's law firm, Paramount used that figure to reduce for accounting purposes to its investors the amount of box office bonus paid to Jones, and then allocated the reduced amount among itself and the investors according to their proportional ownership interests in the copyright for No Country. As a result, Marathon was charged approximately $2 million more than it

would have been had the error not occurred.[4]  Marathon did receive more than $12 million from Paramount for its investment in No Country, however.

The investment agreement contained three provisions that disclaimed the existence of either a partnership or of any fiduciary duties by Paramount.  Paragraph 8, captioned "HOLDING OF FUNDS", stated that "Paramount . . . shall not be considered a trustee pledgeholder, fiduciary or agent of Investor by reason of anything done or any money collected by it, and shall not be obligated to segregate receipts of the Covered Pictures from its other funds."  Paragraph 14, captioned "Tax Matters," states that "Paramount and Investor intend and agree that neither this Agreement nor the transactions contemplated herein shall be treated as or give rise to a partnership for federal income tax purposes or any other purpose."  Exhibit B to the investment agreement included section "III. ACCOUNTING," which applied to accounting statements and allocation of funds to Marathon.  Under subdivision G. of this section, beneath the caption "Creditor-Debtor", it said that "There is a creditor-debtor relationship between Paramount and Investor with respect to the payment of amounts due Investor under the Agreement and nothing

---

[4]  Marathon contends the figure is higher, but the difference is not important to our analysis.  We also note that paragraph 4.1 of the investment agreement expressly permitted Paramount to deduct from its gross receipts calculations the amount of any expenditures or *liabilities* it incurred in connection with a covered picture.  (Italics added.)  Paragraphs 7.1 and 7.2 gave Marathon the right to audit financial records and related agreements for covered pictures, rights which were spelled out in Schedule B.  Under "NET PRODUCTION INVESTMENT AUDITS", audit information was to include "[c]ontracts for all 'above the line' personnel entitled to receive main title credit."  A sample exhibit (Exhibit X-1) that listed the information supplied to the auditor included a statement that the auditor "obtained and read contracts for significant above-the-line talent (writers, producers, directors or actors earning more than US $100,000 in basic compensation throughout the entire production as identified to us by Paramount management) and verified that the contracts were signed and payments reflected in the Production Cost Detail Report agree with the terms of those contracts."  This meant that Marathon could have inspected the Jones contract if it had wanted to.  Finally, paragraph 11.2 stated that Paramount had not made any express or implied warranties or representations concerning the amount of money any of the movies might make or that there would be any money payable to Marathon at all, and that Marathon would not "make any claim that Paramount has failed to realize receipts or revenues which should or could have been realized in connection with the Covered Pictures . . . ."

contained in the Agreement shall be construed to create an agency, trust or fiduciary obligation with respect to such amounts . . . ."

Marathon contended that the investment agreement gave rise to a joint venture between it and Paramount, which therefore made Paramount its fiduciary. Marathon also contended that a fiduciary duty arose from the fact that it entrusted its money with Paramount and gave Paramount full control over the use of those funds. According to Marathon, Paramount breached its fiduciary duty in several ways: By failing to catch the box office bonus drafting error in Jones's contract; by not notifying Marathon once Paramount learned of the error, even throughout the arbitration with Jones; by rejecting Jones's $3 million settlement offer; by not pursuing a legal malpractice claim against another lawyer who worked on the Jones compensation agreement; and by not disclosing in its accounting statement why it had deducted the sum of money that Marathon later learned was attributable to the drafting error in the Jones contract.

The trial court never reached those issues, however, finding instead that, under New York law, the investment agreement's disclaimers of fiduciary duty were effective because the agreement did not operate to create a joint venture. The trial court later granted Paramount's posttrial motion for attorney's fees, awarding it more than $690,000.

## DISCUSSION

1.    *New York Law Applied to Interpretation of the Investment Agreement*

The investment agreement stated that "THE TERMS OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE WITHIN, AND TO BE PERFORMED WITHIN, SUCH STATE, EXCLUDING CHOICE OF LAW PRINCIPLES OF SUCH STATE THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN NEW

YORK."[5] Pursuant to this provision, the trial court applied New York law when construing that agreement. Marathon contends the trial court erred by doing so.

Marathon's primary argument is based on the applicability of *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459 (*Nedlloyd*). The *Nedlloyd* court considered a choice of law provision in a stock purchase agreement, which stated, "This agreement shall be governed by and construed in accordance with Hong Kong law and each party hereby irrevocably submits to the non-exclusive jurisdiction and service of process of the Hong Kong courts." (*Id.* at p. 463.) The Supreme Court rejected a claim that the provision did not apply to a cause of action for breach of fiduciary duty on the theory that such a claim was independent of the shareholders' agreement and outside the intended scope of the clause. The Supreme Court applied Hong Kong law. Marathon contends that *Nedlloyd* does not apply to its fiduciary duty claim because the choice of law provision in the investment agreement with Paramount –stating that "the terms of this agreement" would be construed under New York law – is narrower than the one at issue in *Nedlloyd* – which stated that "this agreement" (not "the terms of this agreement") would be construed under another forum's law. We disagree.[6]

*Nedlloyd* held that "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." (*Nedlloyd, supra,* 3 Cal.4th at p. 468.) In reaching this conclusion, the *Nedlloyd* court focused on the provision's statement that the agreement would be "governed by" Hong Kong law. That phrase "is a broad one signifying a relationship of absolute direction, control, and restraint. Thus, the clause reflects the parties' clear contemplation that 'the agreement' is to be completely and absolutely

---

[5]    The agreement also provided for the nonexclusive jurisdiction of the New York state courts or of the United States District Court for the Southern District of New York.

[6]    We apply California law because the parties have never addressed the applicable New York law and have instead relied solely on the law of California. (*Nedlloyd, supra,* 3 Cal.4th at p. 469, fn. 7.)

8

controlled by Hong Kong law. No exceptions are provided." (*Id.* at p. 469.) Because the defendant's alleged fiduciary duties could arise and exist only because of the parties' agreement, Hong Kong law must govern the legal duties "created by or emanating from" that agreement in order to completely control the agreement of the parties. (*Ibid.*)

This conclusion "comports with common sense and commercial reality," the *Nedlloyd* court held, because no "rational businessperson[] attempting to provide by contract for an efficient and business-like resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." (*Nedlloyd, supra,* 3 Cal.4th at p. 469.)

We see no meaningful difference between the choice-of-law provision at issue here and the one at issue in *Nedlloyd*. Construing "this agreement" necessarily includes construing its terms. Most important, the *Nedlloyd* court focused on the phrase "governed by," which is also present in the investment agreement with Paramount. As in *Nedlloyd*, the agreement was made by sophisticated commercial entities. In order to govern their agreement, New York law must apply to Marathon's breach of fiduciary duty claim, which is both created by and emanates from the investment agreement.[7]

Marathon challenges the choice-of-law ruling on two other grounds that appear to stem from *Nedlloyd*. The *Nedlloyd* court established certain guidelines for trial courts to follow when determining whether a contractual choice of law provision is enforceable. The court must first determine whether the chosen state has a substantial relationship to the parties or their transaction, or whether there is any other reasonable basis for the parties' choice of law. If neither test is met, the court need not enforce the choice of law provision. (*Nedlloyd, supra,* 3 Cal.4th at p. 466.) If either test is met, however, the court must then determine whether the chosen state's law is contrary to a fundamental policy of California. If no such conflict exists, then the court shall enforce the choice of law provision. If there is a fundamental conflict with California law, the court must then

---

[7]     Marathon relies on the dissent in *Nedlloyd* to undermine its rationale. Even a strongly worded dissent such as the one in *Nedlloyd* does not negate our duty to abide by the majority ruling.

determine whether California has a materially greater interest than the chosen state in the determination of the particular issue. The choice of law provision will not be enforced if California has such an interest. (*Ibid.*)

Marathon contends that the New York choice of law provision is not enforceable because: (1) Paramount has its principal place of business in California and the actions giving rise to the complaint took place in California; and (2) Marathon filed suit in California and is therefore entitled to the application of California law "as a matter of California public policy." Although Marathon does not cite *Nedlloyd* or any other authority to back up these contentions, we view them as an attempt to assert *Nedlloyd's* tests concerning whether there is a substantial relationship between the parties or their transaction to New York law and whether the choice-of-law provision is contrary to a fundamental policy of California law.

As to the first, Marathon's principal place of business is in New York state, as is the parent company of Paramount, Viacom, Inc. Thus, there is a substantial relationship between the parties and New York. As to the second, Marathon never invokes the term "fundamental" when mentioning California policy, and never identifies such a policy. We therefore deem that issue waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700.) Accordingly, we conclude that the trial court did not err by applying New York law to this dispute.

2. *Paramount Was Not a Fiduciary*

Focusing primarily on California law, Marathon contends that Paramount was its fiduciary because the investment agreement effectively created a joint venture that overcame the contractual disclaimers of fiduciary duty, or because Paramount's exclusive control over Marathon's funds gave rise to such a duty, where Marathon reposed trust and confidence in Paramount. As previously noted, however, New York law applies to this dispute, making California law inapplicable. Because the parties agree that there was no disputed evidence concerning the proper interpretation of the investment agreement,

10

we exercise our independent review when construing its provisions.  (*Ditmars-31 Street Development Corp. v. Punia* (1962) 17 A.D.2d 357, 361 [235 N.Y.S.2d 796].)

The language of a contract must be given a practical interpretation in order to meet the reasonable expectations of the parties.  (*Petracca v. Petracca* (N.Y.A.D. 2003) 756 N.Y.S.2d 587 [302 A.D.2d 576, 576-577].)  The contract must be read as a whole and, if possible, interpreted to give effect to its general purpose.  Particular words should not be isolated from the whole, but must be considered in context.  (*William C. Atwater & Co. v. Panama R. Co.* (N.Y. 1927) 264 N.Y. 519, 524 [159 N.E. 418, 419].)  The court's role is to ascertain the parties' intent at the time they entered the contract, which, if it is not ambiguous, may be determined from the plain language of their agreement.  (*Evans v. Famous Music Corp.* (Ct. App. 2004) 1 N.Y.3d 452, 458 [775 N.Y.S.2d 757].)

Under New York law, joint venturers are fiduciaries.  (*Solutia, Inc. v. FMC Corp.* (S.D.N.Y. 2006) 456 F.Supp.2d 429, 442-443.)  There are five requirements to the formation of a joint venture in New York:  (1)  two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2)  their agreement must evidence their intent to be joint venturers; (3)  each must contribute property, financing, skill, knowledge, or effort; (4)  each must have some degree of control over the venture; and (5)  there must be a provision for the sharing of both profits and losses.  (*Id.* at p. 445.)[8] Nothing in the investment agreement shows the intent to create a joint venture.  To the contrary, the agreement states in several places that the parties disclaimed any fiduciary duties or agency, trustee, and partnership relationships.  The investment agreement also

---

[8] California law is substantially the same.  The existence of a joint venture depends on the intention of the parties and requires a joint interest in a common business, an understanding that profits and losses will be shared, and a right to joint control. (*580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 15-16.)

11

expressly deprives Marathon of any control whatsoever concerning the covered pictures. Therefore no joint venture was created under New York law.**9**

Any other potential bases for the existence of a fiduciary duty are negated by the investment agreement's express disclaimers that no such relationship was created. Under New York law, explicit and unambiguous disclaimers of a fiduciary relationship are enforceable. (*BNP Paribas Mortg. Corp. v. Bank of America* (S.D.N.Y. 2012) 866 F.Supp.2d 257, 269; *Valentini v. Citigroup, Inc.* (S.D.N.Y. 2011) 837 F.Supp.2d 304, 326; *Levine v. Murray Hill Manor Co.* (A.D. 1 Dept. 1988) 143 A.D.2d 298, 300 [532 N.Y.S.2d 130]; *Cathy Daniels, Ltd. v. Weingast* (2012) 91 A.D.3d 431, 433 [936 N.Y.S.2d 44].) Parties in nonfiduciary relationships are free to contractually waive prospective fiduciary duties to one another. (*Cooper v. Parsky* (2nd Cir. 1998) 140 F.3d 433, 439 [agreement by which shareholders gave corporate directors right to cast proxy votes of their shares; express disclaimer of fiduciary duty and limitation of liability to gross negligence or willful misconduct enforced]; *Solutia, Inc. v. FMC Corp., supra,* 456 F.Supp.2d at pp. 446-447.)**10**

Marathon relies on a pair of older New York decisions to show that Paramount was its fiduciary – *Martin v. Peyton* (N.Y. 1927) 246 N.Y. 213 [158 N.E. 77] (*Martin*) and *Rubenstein v. Small* (N.Y.A.D. 1947) 273 A.D. 102 [75 N.Y.S.2d 483] (*Rubenstein*). Neither alters our conclusion.

---

**9** Paramount contends there was no true sharing of profits and losses because Paramount paid for all the distribution costs, which greatly exceeded the production costs of the covered pictures, and because Marathon was not required to pay more than the investment price for any covered picture even if the film lost money. Based on our holding that a joint venture was not created because the agreement does not evidence such an intent and because Marathon had no control over the enterprise, we need not reach that issue.

**10** The flip side of these decisions is found in *N.E. General Corp. v. Wellington Adv.* (N.Y. 1993) 82 N.Y.2d 158 [624 N.E.2d 129]. In that case, New York's highest state court held that although parties are free to contract for the existence of fiduciary duties among themselves, unless the relationship between the parties is fiduciary as a matter of law, the courts should not impose such duties if the parties have not done so themselves. (*Id.* at pp. 131-133.)

12

At issue in *Martin* was whether the trial court properly sustained demurrers to a complaint on the ground that the defendants were not partners of a brokerage firm to which they had loaned money. In affirming that order, the *Martin* court noted that the loan agreement which was the source of the alleged partnership disclaimed any such relationship. However, disclaimers of that type might be a sham, the court observed, and the true nature of the parties' business relationship was to be determined by the terms and effect of their agreement. (*Martin, supra,* 158 N.E. 77 at p. 78.) Even though the loan agreement imposed a complex of arrangements giving the defendants substantial control over the firm and its principals, the court concluded that no partnership had been formed. (*Id.* at pp. 79-80.)

The plaintiff in *Rubenstein* loaned money to the producer of a vaudeville show, with repayment to come from unused loans, advances, and the excess of gross receipts over production costs and operating expenses, if any. Instead of interest, the plaintiff would be paid 10 percent of the net receipts. The defendant was supposed to furnish regular detailed financial statements showing costs, expenditures, and receipts. The agreement indicated that other parties might loan money to the production on the same terms. It also stated that the parties were not partners, joint venturers, or principal and agent. When the defendant refused to pay back any of the loan funds or to provide an accounting, the plaintiff brought an equitable action for an accounting. The trial court sustained the defendant's demurrer on the ground that the plaintiff had an adequate remedy at law.

The *Rubenstein* court reversed. First, in reliance on *Martin, supra,* 158 N.E. 77, it held that the disclaimer of a partnership, joint venture, or agency relationship was not determinative, leaving it free to examine the true nature of the parties' relationship. (*Rubenstein, supra,* 75 N.Y.S.2d at p. 485.) Next, it held that the agreement did not create a true debtor-creditor relationship because the possibility that the plaintiff might not be repaid meant he had not made a true loan of money. (*Id.* at pp. 485-486.) Instead, a fiduciary relationship respecting the use of plaintiff's funds was created, placing on

13

defendant the duty to account for his use of the funds.  Therefore, a cause of action for the equitable remedy of accounting had been pled.  (*Id.* at p. 486.)

From *Martin, supra,* 158 N.E. 77, and *Rubenstein, supra,* 75 N.Y.S.2d 483, we derive the rule that despite any contractual disclaimers to the contrary, fiduciary relationships such as that of partners or joint venturers may be created by the operative effect of the parties' agreement.  As we have already held, however, nothing in the investment agreement here gave rise to a joint venture under New York law.

The investment agreement here spelled out the nature and effect of Marathon's investment in the various covered pictures.  Those terms also supplied a formula by which Marathon might receive a return on its investments, along with Paramount's express duty to provide an accounting.  Those same terms also clearly and explicitly stated that no fiduciary duties were created by the investment agreement.[11]  Based on this, we conclude that neither *Martin* nor *Rubenstein* is applicable, and that Marathon's express waiver of any fiduciary duties by Paramount was effective.[12]

---

[11]    At oral argument, Marathon relied on our recent decision in *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, where we held there was substantial evidence to support a jury's verdict that a business promoter owed, and breached, his fiduciary duty to investors by using their money to fund a successor business after the one in which they invested had failed.  We reject Marathon's reliance on this decision for several reasons.  First, we are applying New York law, not California law.  Second, the agreement did not include the disclaimers of fiduciary duty found here or in the New York decisions we have cited.  Third, the agreement in *Cleveland* was not between sophisticated entities represented by counsel, and did not include the disclaimers of fiduciary duty present here or in decisions like *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 387, as we noted in *Cleveland.*  Fourth, in *Cleveland,* we held that the relationship imposed fiduciary duties as a matter of law because for all intents and purposes, the plaintiffs were stockholders, as to whom promoters owe fiduciary duties. (*Cleveland* at pp. 1342-1343.)  There is no promoter-stockholder relationship here.

[12]    Because we affirm the judgment on the ground no fiduciary duty existed, we need not reach Marathon's contentions that Paramount in fact *breached* its fiduciary duties, that Marathon is entitled as a matter of law to judgment in the sum of more than $3.6 million, and that we should remand the matter for a new trial as to punitive damages.

3.     *Marathon Was Not Wrongfully Deprived of Its Right to a Jury Trial*

Paramount brought a pretrial motion to have this action decided at a court trial, not by a jury, on two grounds:  (1)  the breach of fiduciary duty claim was equitable in nature, meaning no jury trial was warranted; and (2)  no jury trial was required because there would be no extrinsic, disputed evidence concerning the interpretation of the investment agreement, making the matter one for the court, not a jury.  The trial court granted the motion on the first ground.  Marathon contends the trial court erred.[13]

Rather than parse more than 100 years of jurisprudence concerning the nature of actions in equity, law, or chancery, we choose to affirm on the alternative ground for Paramount's bench trial motion:  that no jury was required because at issue was the interpretation of a contract based solely on the contract terms and certain undisputed background facts, which are questions of law for a court to decide.  In such a case, there is no right to have a jury resolve the dispute.  (*Garcia v. Truck Insurance Exchange* (1984) 36 Cal.3d 426, 439; *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1451.)  Because that was the case here, we agree with Paramount that Marathon was not entitled to a jury trial.  Furthermore, Marathon did not address this issue in either its opening appellate brief, or, after respondent's brief did so, in appellant's reply brief.  As a result, we affirm the trial court's order on the alternative ground that the issue has been waived.  (*Landry v. Berryessa Union School Dist., supra,* 39 Cal.App.4th at pp. 699-700.)

4.     *Attorney's Fees*

The investment agreement provided that costs and reasonable attorney's fees would be awarded to the prevailing party in "any action, suit, or other proceeding [that] is instituted concerning or arising out of this agreement."  Marathon challenges the trial

_____

[13]     On September 28, 2011, we summarily denied Marathon's writ petition challenging the trial court's bench trial order.  Our summary denial was not law of the case and did not preclude us from considering the issue once again.  (*Frisk v. Superior Court* (2011) 200 Cal.App.4th 402, 415.)

15

court's order awarding Paramount attorney's fees of more than $690,000 on two grounds: (1) the attorney's fee provision in the investment agreement was not broad enough to cover the tort claim for breach of fiduciary duty; and (2) the amount awarded was excessive. We take each in turn.

Marathon relies on *Kangarlou v. Progressive Title Co., Inc.* (2005) 128 Cal.App.4th 1174, for the proposition that tort claims such as breach of fiduciary duty do not enforce a contract and are not considered actions on a contract for purposes of the reciprocal attorney's fee provision found at Civil Code section 1717.

The plaintiff in *Kangarlou* was a home buyer who sued her real estate agent, real estate broker, and escrow company for breach of fiduciary duty in several respects: failing to obtain evidence that a broker was regularly licensed before delivering compensation to him, communicating to her facts learned about the escrow instructions or the broker's license, exercising reasonable skill and diligence in carrying out the escrow instructions, and strictly complying with her written instructions concerning the delivery or money or documents at the close of escrow. The jury found for the plaintiff and the trial court awarded her attorney's fees under a provision in the escrow agreement which provided that if the plaintiff failed to pay fees or expenses due under the escrow instructions, she agreed "to pay the attorney's fees and costs incurred to collect such fees or expenses."

Under Civil Code section 1717, that one-sided fee provision gave the plaintiff the reciprocal right to recover fees in actions on, or to enforce, the contract. Although tort claims do not ordinarily "enforce" contract terms, some tort claims may also constitute a breach of contract as well. (*Kangarlou, supra,* 128 Cal.App.4th at p. 1178.) Because the fiduciary duties which underlay the plaintiff's claim arose out her contract, the court held that her tort claim was on the contract for purposes of awarding attorney's fees under Civil Code section 1717. (*Kangarlou,* at p. 1179.)

As we read *Kangarlou*, it actually undercuts Marathon's contention. Marathon's fiduciary duty claim against Paramount was based on duties that arose under the contract: to account for and pay all sums owed pursuant to the investment agreement's provisions.

16

Regardless, we are reviewing a far broader provision than the one in *Kangarlou*. Here, the parties agreed to pay fees to the party who prevailed on actions arising out of their contract. Such broadly worded provisions are construed to encompass tort claims (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 607) and we therefore reject Marathon's contention.

As for the size of the award, Paramount requested fees of $768,948.40, but the trial court, after reviewing the billing records submitted in support of the fee motion, determined that some of the time billed was duplicative and excessive. The trial court therefore reduced the award to $690,548.80. The trial court also found that the hourly rates being charged – ranging from $192 to $587 for lawyers and $60 to $150 for paralegals – was reasonable. Marathon contends the fee award is still too high because it represents 1,974 hours of lawyers' time, an amount that Marathon believes is excessive and unreasonable.[14]

We review the trial court's order under the abuse of discretion standard, keeping in mind that the experienced trial judge is in the best position to determine the value of legal services rendered in his court. (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 148-149.) We make all reasonable presumptions in favor of the trial court's order where the record is silent, and Marathon has the burden of affirmatively showing error, along with a record adequate to do so. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140-1141.) Marathon does not point to a single instance where the billing records show an unreasonable, unnecessary, or duplicative charge. As a result, it has failed to carry its burden of affirmatively showing error and, under the applicable standard of review, we defer to the trial court's reasoned assessment of the matter.

---

[14] On appeal, Marathon does not challenge the hourly rates claimed by Paramount's lawyers.

## DISPOSITION

The judgment and the postjudgment order awarding Paramount its attorney's fees are affirmed.  Respondent Paramount shall recover its appellate costs.


                                            RUBIN, J.

WE CONCUR:


        BIGELOW, P. J.


        GRIMES, J.