Filed 6/16/21  Montpelier Nut Co. v. Ditzler CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MONTPELIER NUT COMPANY, INC., Plaintiff and Respondent, v. LEE DITZLER, et al., Defendants and Appellants. | F079705 (Super. Ct. No. 2020175) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Law Office of James Martinez and James Martinez for Defendants and Appellants.

Goodin, MacBride, Squeri & Day, Robert A. Goodin and Francine T. Radford for Plaintiff and Respondent.

-ooOoo-

In this breach of contract case tried without a jury, the trial court found in favor of plaintiff Montpelier Nut Company, Inc., and against defendants Purotecs, Inc. (Purotecs) and Lee Ditzler (together defendants).  The asserted breach of contract related to an almond pasteurization machine or system sold to plaintiff that did not perform as promised.  In support of its determination for plaintiff, the trial court issued a Statement

of Decision containing detailed factual findings, and a judgment awarding damages to plaintiff was entered accordingly.  Defendants appeal from that judgment.  Although the appeal by defendants ostensibly challenges the sufficiency of the evidence to support the judgment, their brief largely ignores the evidentiary bases for the factual findings made by the trial court in its Statement of Decision.  Such a selective and incomplete factual challenge is inadequate to meet defendants' burden on appeal.  In any event, we conclude from our review of the record that substantial evidence supported the trial court's judgment.  Therefore, the judgment of the trial court is hereby affirmed.

## FACTS AND PROCEDURAL HISTORY

The Contract

In December 2008, plaintiff, an almond rancher and processor located in Denair, California, contracted with a company known as Invenx, Inc. (Invenx)[1] for the purchase and installation of a system that would purportedly pasteurize almonds using ozone.  As summarized in the trial court's Statement of Decision, plaintiff purchased the pasteurizing system because the California Almond Board, pursuant to authority promulgated by the Food and Drug Administration (FDA), had recently implemented regulations requiring almonds sold in North America to be pasteurized to protect against salmonella.  To achieve adequate pasteurization as defined by the FDA, a "5-log kill" had to be attained, meaning salmonella bacteria had to be reduced by 100,000-fold (i.e., 10 to the fifth power) by the treatment.  Further, in order to meet regulatory requirements, a pasteurization treatment system must be "validated" by the California Almond Board, a rigorous process requiring analysis of multiple samples in several processing runs.  To be validated for a 5-log kill, every sample tested in the system must meet or exceed a 5-log reduction of salmonella bacteria.

---

[1] As will be seen, the trial court held that a subsequently created entity, Purotecs, Inc., was the successor to Invenx for purposes of the parties' contractual obligations.

The contract between Invenx and plaintiff provided for an "operating system to treat up to 4000# of almonds per hour in batches of 2000 pounds of almonds." Invenx described the system in the contract as follows: "The Cold Pasteurization process utilizes a sealed stainless steel treatment chamber in which the entire process occurs. The process incorporates moisture for the surface of the almonds, vacuum decompression, injection of ozone, pressurization and injection of the [Invenx] process liquid. The entire process is organic as specified under the USDA Organic Rule 2000." Some of the mechanical parts for the system would be provided or built by a third party, referred to as EMC or Lemos Enterprises. Importantly, the contract provided certain guarantees to plaintiff, including the following: "[Invenx] will guarantee that the processed almonds will meet the 5 log reduction for Salmonella bacteria as required by the FDA and the California Almond Board. … [¶] The treatment system will be tested prior to delivery to [plaintiff] and re-tested during production after start-up. [Invenx] will perform the pre installation tests to confirm the proper operation of the system and a second set for production tests to document the biological results for the FDA and the California Almond Board. All costs associated with the biological testing are included in the total price. Biological testing will be validated by a mutually agreed upon laboratory."

Additionally, personal guarantees were provided within the contract by Invenx's two co-owners, namely, Lee Ditzler and Robert Higgins, the president and vice-president of Invenx, respectively. As noted by the trial court, Ditzler founded Invenx in 2008, while Higgins invested in the company and became a financial partner. The personal guarantees by Ditzler and Higgins stated: "[Invenx] understands that this is the first installation of the full scale process and that [plaintiff] desires to have a guarantee that the process meets the 5 log reduction of Salmonella bacteria as required by the FDA and the California Almond Board. [Invenx] agrees to provide the personal guarantee from the two principal owners that the process meets the treatment requirements of 5 log reduction

3.

of Salmonella. The monies paid to [Invenx] for the process equipment will be returned to [plaintiff] if the system fails to meet the 5 log reduction of Salmonella."

The total price for the system was $695,000. The contract provided an estimated delivery date of "120 days ARO and down payment." The contract was signed by Lee Ditzler and Robert Higgins for Invenx on December 3, 2008, and by Ken Alldrin on behalf of plaintiff on December 7, 2008. Plaintiff paid a total of $638,000, which represented all but a portion of the purchase price due upon the successful operation of the system for 30 days.

Plaintiff's System Installed

Invenx installed the pasteurization system in 2010. Unbeknownst to plaintiff, Invenx was by this time in financial distress. Ditzler testified that he closed Invenx in March 2010, and it ceased operations at that time. Without telling plaintiff that Invenx had been shut down, Ditzler worked on plaintiff's system and conducted many tests. The system occasionally achieved some 5-log kills, although not consistently, and even when the numbers were close to or met the desired mark, the almonds did not emerge from the process in a salable fashion – i.e., they were too wet and/or had a bad odor from too much ozone. Throughout, Ditzler constantly reassured plaintiff that things were going well, that he was on the verge of succeeding, and that he would make the necessary adjustments to make the system work and get it ready for validation.

Purotecs Is Formed

In its Statement of Decision, the trial court summarized the background facts and circumstances surrounding the formation of Purotecs. We recite below some of the trial court's descriptions and findings of what happened on that subject, which are helpful to

4.

provide a framework for understanding the trial court's conclusion that Purotecs was liable as Invenx's successor.[2]

The trial court's Statement of Decision provided as follows: "[D]uring the course of performance of [plaintiff's] contract, and unbeknownst to [plaintiff], Invenx went out of business. Mr. Higgins, Mr. Ditzler's investor in Invenx, had left and sued Mr. Ditzler and Invenx for fraud; Invenx cross-complained against him. After Mr. Higgins left Invenx, Mr. Ditzler began talking to potential new investors, one of whom was Ken Stevens. Mr. Stevens had no knowledge about ozone or experience with it. He inspected Mr. Ditzler's main project, the [plaintiff's] pasteurizer on site, on February 8, 2012. An investment in Invenx was initially contemplated, but on the advice of Invenx's lawyer, Mr. Stevens and Mr. Ditzler decided to form a new entity instead, which was Purotecs. [¶] Before Purotecs was formed, Mr. Ditzler negotiated an employment agreement for himself, as his know-how was integral to the enterprise. Mr. Ditzler received almost half of Purotecs' stock, as well as a generous salary and signing bonus. In return, Mr. Ditzler gave Purotecs all of Invenx's assets. Invenx's tangible assets were minimal. Its true assets were its intellectual property: specifically, the ozone system technology and Mr. Ditzler's knowledge."

Further, according to the trial court's Statement of Decision: "Purotecs was incorporated on March 30, 2012. Besides being a shareholder, Mr. Ditzler was an officer and director of Purotecs. Purotecs was formed to pursue the same business as Invenx. Purotecs had no products when it was formed; its first product was the Invenx ozone generator. Purotecs was not merely selling generators, but, like Invenx, was selling 'ozone solutions' designed by Mr. Ditzler. [¶] Purotecs' principals told [plaintiff] that Purotecs was taking over the project and would get it completed. … [¶] Purotecs

---

[2] In our quotation of the language of the Statement of Decision, some of the trial court's internal references or citations to transcript pages or exhibit numbers are deleted.

proceeded to work on [plaintiff's] system." The remainder of the trial court's description in the Statement of Decision regarding Purotecs's role emphasized the involvement of Stevens and Ditzler in seeking to complete plaintiff's system on behalf of Purotecs.

Plaintiff's System Never Achieved Satisfactory Results

The pasteurizing system sold to plaintiff never performed as promised. As the trial court explained, the test results were inconsistent and unsatisfactory: "In June of 2013, one of the lab test reports showed, for the three samples tested, two five-log kills and a six-log kill: a result that (if replicated for each and every one of three samples in at least ten runs) would have supported validation at 5 logs. This never happened. The single 5-log kill report for three samples was followed nine days later by a test that yielded a 3-log kill along with two 5s, and next, in July 2013, by a report on seven samples, with four 3s and three 4s. Exhibit 240 (the summary of test results) shows that Mr. Ditzler never again achieved a 5-log kill for all samples being tested on any given day. Moreover, whatever good results he got were achieved by adding so much steam and ozone to the process that the almonds were too wet, and too smelly to be salable."[3]

Procedural History

Plaintiff filed its complaint on May 17, 2016. Plaintiff's complaint alleged breach of contract against Purotecs and breach of guaranty against Ditzler. The parties waived a jury trial, and the case was tried to the court, beginning on July 24, 2018, and ending on January 11, 2019.

At trial, the court heard, weighed and considered extensive witness testimony along with multiple exhibits. On June 4, 2019, after the close of trial and posttrial briefing, the trial court issued its Statement of Decision wherein it explained the legal and factual basis for its decision in plaintiff's favor. In its Statement of Decision, the trial court made the following findings and conclusions on the ultimate issues before it: the

---

[3] See footnote 2, *ante*.

contract was breached because the cold pasteurization system failed to perform as promised; plaintiff's damages for breach of contract were $899,907.80, plus prejudgment interest; Purotecs was liable for the breach of contract as Invenx's successor; and defendant Ditzler was personally liable on his Guarantee in the sum of $638,000. Additionally, in regard to certain defenses raised by defendants, the trial court held defendants were estopped from asserting the statute of limitations, and no written agreement was necessary to impose successor liability on Purotecs. The trial court concluded by expressly finding that Ditzler's testimony lacked credibility, due to his many inconsistencies on a number of critical points. These significant inconsistencies included, among other things, Ditzler's testimony "that Purotecs did not tell [plaintiff] it was taking over the pasteurization process, and … that his efforts to complete the project after the formation of Purotecs were not made on behalf of Purotecs but were done on his own behalf."

The trial court filed its final judgment on June 4, 2019, in accordance with its Statement of Decision. In the judgment, plaintiff was to recover as damages from defendants Purotecs and Ditzler, jointly and severally, the sum of $638,000, plus prejudgment interest of $205,383.20; and in addition thereto, plaintiff was to recover a further sum of $261,907.80 from Purotecs, plus prejudgment interest in an additional amount of $84,312.34. On June 4, 2019, notice of entry of the judgment was filed.

Defendants' timely notice of appeal followed.

## DISCUSSION

### I. Standard of Review

A reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark*).) Moreover, the judgment or order of the trial court is presumed to be correct on appeal, and an appellant must affirmatively demonstrate error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "In furtherance of this burden, the

7.

appellant must fairly summarize all the facts in the light most favorable to the judgment." (*Burch v. CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 349.)  That is, an appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law.  (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 (*Rayii*); *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 (*Fink*).)

Where an appellant contends that some particular finding of fact is not supported, he or she is " 'required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*.  Unless this is done the error is deemed to be waived.' " (*Foreman & Clark*, *supra*, 3 Cal.3d at p. 881.)  "An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient.  The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.  An appellant … who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment." (*Rayii*, *supra*, 218 Cal.App.4th at p. 1408; *Fink*, *supra*, 25 Cal.3d at p. 887; *Foreman & Clark Corp.*, *supra*, 3 Cal.3d at p. 881.)  Again, a failure to summarize all the material evidence, *favorable and unfavorable*, and to show why it is insufficient amounts to a waiver of the alleged error.  (*Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 935; *Bell v. H.F. Cox, Inc*. (2012) 209 Cal.App.4th 62, 80; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

If defendants' appeal has adequately raised error concerning the trial court's findings of fact, we review such contention of error under the substantial evidence standard.  "We review the trial court's factual findings for substantial evidence. [Citation.]  … [A]ppellants…bear the burden of demonstrating there is no substantial evidence to support a challenged factual finding.  [Citation.]  [¶]  Our review of the trial

court's factual findings presumes that the record contains evidence to sustain every finding of fact. [Citation.] We view the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving all conflicts in the evidence in support of the judgment. [Citation.] We do not reweigh the evidence, consider the credibility of the witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. [Citation.] If substantial evidence exists, it is of no consequence that the trial court [if] believing other evidence or drawing other reasonable inferences might have reached a contrary conclusion." (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1208-1209 (*Picerne*).)

## II. Substantial Evidence Supported Estoppel to Assert the Statute of Limitations

Defendants argue the evidence at trial established the statute of limitations had expired. They point out that the pasteurization system purchased by plaintiff was not performing as promised and this failure was apparent during the testing in 2010 and 2011. The system's failure at that time would purportedly have caused the breach of contract claim to accrue. Plaintiff did not file its action until May 17, 2016. Thus, according to defendants, the four-year statute of limitations for breach of a written contract as provided at Code of Civil Procedure section 337, subdivision (a), expired before the action was filed in 2016, and, consequently, the action was time-barred. As explained below, we disagree.

First, defendants' opening brief omits any mention of the trial court's finding that defendants' conduct gave rise to an estoppel to assert the statute of limitations, and the brief further omits any discussion of the evidence in support of that finding. Having failed to discuss the evidence upon which the trial court found an estoppel, and having failed to show its insufficiency, defendants' argument on the statute of limitations issue is deemed waived or forfeited. (*Rayii, supra*, 218 Cal.App.4th at p. 1408; *Fink, supra*, 25 Cal.3d at p. 887; *Foreman & Clark, supra*, 3 Cal.3d at p. 881.)

9.

Second, even had the argument not been waived, we would affirm the trial court's finding, because there was sufficient evidence in the record to support an estoppel as to defendants' assertion of the statute of limitations. As summarized in *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33 (*Shaffer*): "A defendant will be estopped to invoke the statute of limitations where there has been 'some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action.' (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 523, p. 550.) It is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff. [Citations.] It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings. [Citation.] '[W]hether an estoppel exists – whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice – is a question of fact and not of law.' " (*Shaffer*, *supra*, 17 Cal.App.4th at p. 43.) The doctrine is applied under principles of equity: " 'One cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought.' " (*Carruth v. Fritch* (1950) 36 Cal.2d 426, 433.)

In *Shaffer*, *supra*, 17 Cal.App.4th 33, a case involving breach of warranty and negligence for defects in the building of a custom home, as well as related emotional distress claims, the Court of Appeal held that where the filing of the lawsuit by the plaintiffs was delayed as a result of reliance on the defendants' continuing promises to repair or remedy the property damage, a trier of fact could reasonably apply estoppel regarding the invocation of the statute of limitations defense. (*Id*. at pp. 43-44.) Similarly, in *Gilbert Financial Corp. v. Steelform Contracting Co*. (1978) 82 Cal.App.3d 65, a general contractor's promises to cure or correct construction-related water leak problems, including his actual efforts to do so for approximately three years, were

10.

referred to by the Court of Appeal as a permissible basis for a trier of fact to potentially apply the estoppel doctrine, assuming the trier of fact also concluded such promises were reasonably relied upon by the plaintiff in delaying suit. (*Id*. at pp. 68-69 [reversing dismissal premised on statute of limitations of the negligence cause of action].) In so holding, the Court of Appeal recited with approval the following language from a legal treatise: " 'The first tolling situation is where the defendant makes representations to the effect he will *perform his contractual obligation*, and the plaintiff, in reliance thereon, forbears to sue in time.' " (*Ibid.*, quoting 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 395, p. 1227.)

Here, consistent with the above authorities, the trial court properly concluded that defendants were estopped from claiming the action was time-barred because plaintiff reasonably relied upon defendants' ongoing promises, reassurances and attempts to make the system work, which continued from approximately 2010 to as late as 2015. The record is replete with testimony as to Ditzler's continuing promises and reassurances to the effect that he was working on it, the system is going to work, and just a few more adjustments were needed. Ken Alldrin, one of plaintiff's principals and owners, testified that Ditzler was a convincing man who sounded positive, and since "we" (i.e., plaintiff) really needed the project to work, Alldrin decided to keep believing him. According to Alldrin's testimony, the reassurances continued when Ditzler told Alldrin in 2012 that Purotecs would be taking over the project and had the resources needed to get it done.

In its Statement of Decision, the trial court explained that defendants were estopped from invoking the statute of limitations because Ditzler "continuously assured" plaintiff that he would make the system work, he was making progress, and would " 'get there.' " The trial court further found that Alldrin, plaintiff's co-owner, believed Ditzler. And further, Purotecs "taking over and asking to use [plaintiff's] system to sell to other customers gave Mr. Alldrin reason to believe it would work." Based on our review of the

11.

record, we conclude the trial court's findings were supported by substantial evidence, which furnished a reasonable basis for concluding that estoppel applied.

## III. Substantial Evidence Supported Purotecs' Successor Liability

In their brief on appeal, defendants contend there was insufficient evidence that Purotecs was the successor corporation to Invenx for purposes of the contractual obligations to plaintiff. Defendants argue, among other things, that Purotecs did not purchase all or substantially all of Invenx's assets. There was purportedly some evidence in the record that only ordinary office equipment was transferred to Purotecs and that Robert Higgins subsequently claimed to have obtained Invenx's intellectual property rights. Further, defendants argue there was evidence in the record that Purotecs could not have been a continuation of Invenx because Purotecs' business model distinctly focused on ozone generators, not complete operating systems.

Once again, defendants have sought to reargue the case by setting forth only selective evidence, rather than explaining based on a consideration of all the relevant evidence why it is insufficient to support the trial court's finding on this issue. For that reason, defendants' contention the evidence is insufficient to support a finding of successor liability has been waived or forfeited. (*Rayii, supra*, 218 Cal.App.4th at p. 1408; *Fink*, *supra*, 25 Cal.3d at p. 887; *Foreman & Clark*, *supra*, 3 Cal.3d at p. 881.) But even if not waived or forfeited, and as explained more fully below, we conclude there was substantial evidence in the record to support the trial court's finding of Purotecs' successor liability.

Under the equitable doctrine of successor liability, " 'corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old. Especially is this well settled when actual fraud or the rights of creditors are involved, under which circumstances the courts uniformly hold the new corporation liable for the debts of the former corporation.' " (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1327 (*Cleveland*).)

The general rule concerning successor liability is that "a corporation purchasing the principal assets of another corporation … does not assume the seller's liabilities *unless* (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 (*Ray*), italics added; see *Daniels v. Select Portfolio Servicing*, *Inc.* (2016) 246 Cal.App.4th 1150, 1170; *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.* (2001) 89 Cal.App.4th 746, 753-754 (*McClellan*).)  Whether successor liability is applicable in a given case involves equitable issues to be examined on their own unique facts.  (*Cleveland*, *supra*, 209 Cal.App.4th at p. 1330.)

Of the four grounds for finding successor liability enumerated in *Ray, supra,* 19 Cal.3d at page 28, the mere continuation ground has been recognized only where certain indicia are present.  "California decisions holding that a corporation acquiring the assets of another corporation is the latter's *mere continuation* and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements:  (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." (*Ray*, *supra*, 19 Cal.3d at p. 29, italics added; accord, *Wolf Metals, Inc. v. Rand Pacific Sales, Inc.* (2016) 4 Cal.App.5th 698, 705 (*Wolf Metals*).)

Based on the Statement of Decision, the trial court approached the question of successor liability in two basic steps:  first, the court foundationally found that Purotecs had acquired the principal assets of Invenx; and second, the court determined that grounds existed for successor liability against Purotecs because Purotecs (a) impliedly agreed to assume Invenx's liability to complete the contract and (b) was a mere

13.

continuation of Invenx.  As we will explain, each of these findings was supported by substantial evidence in the record.

A.  Purotecs Acquired Invenx's Principal Assets

For successor liability to apply, it must be shown that the successor corporation acquired its predecessor's assets.  (*Ray*, *supra*, 19 Cal.3d at p. 28; see e.g., *McClellan, supra,* 89 Cal.App.4th at pp. 753-754.)  Here, the trial court found that was the case, specifically holding "Purotecs acquired all of the property and assets of Invenx."  In describing the assets acquired by Purotecs, the trial court noted that Invenx's tangible assets were minimal, whereas Invenx's "true assets were its intellectual property: specifically, the ozone system technology and Mr. Ditzler's knowledge."

We agree with the trial court that there was ample evidence from which to reasonably infer that Purotecs acquired Invenx's principal assets.  Based on Invenx's August 2013 bankruptcy filing, by the time Invenx filed for bankruptcy, it no longer had *any* assets.  The same filing stated that in March 2012, which we note was the approximate date that Purotec was formed, Invenx's "inventory" or "assets" were transferred to Purotecs.  Ditzler admitted that when he closed down Invenx, he placed Invenx's assets into storage; whereas, a subsequent bankruptcy filing stated that the assets transferred to Purotecs included "all items" in storage, such as "computers … ozone equipment parts and inventory and test equipment."  This later bankruptcy filing indicated an effective date of transfer of April 2012, rather than the earlier reported March 2012 date.  Kenneth Stevens, one of the principals involved in Purotecs' formation, confirmed that as of April 2012, Purotecs purchased all of Invenx's tangible assets.  Based on the above, it was reasonable for the trial court to conclude that all of Invenx's tangible assets – including ozone pasteurization equipment and inventory – were transferred to Purotecs.

There was also adequate evidence for the trial court to reasonably infer that Invenx's intellectual property was transferred to Purotecs.  Invenx filed its bankruptcy

14.

petition in August 2013, and it was indicated therein that Invenx did not own any intellectual property at that time. Moreover, the fact Purotecs had taken over the work on plaintiff's ozone pasteurization system in 2012, and the only knowledge of plaintiff's pasteurization system resided with Ditzler, who began working as an employee for Purotecs at its formation, the trial court could reasonably infer that Invenx had transferred its intellectual property rights to Purotecs. This inference is further supported by the generous employment agreement Ditzler was able to secure for himself shortly before Purotecs was formed, which included a large salary, signing bonus, and a right to nearly half of Purotecs' stock. This was because Purotecs needed Ditzler's ozone expertise. For Purotecs to be viable, it was obviously necessary that Ditzler be directly involved, because his expertise, know-how and intellectual understanding of the process was integral to the enterprise. Finally, the transfer of Invenx's intellectual property to Purotecs was also reasonably indicated by the fact that Purotecs' principals, i.e., Stevens and Ditzler, communicated to plaintiff that Purotecs' basic plan was to get plaintiff's system validated and then sell it to other clients; and when requested Alldrin gave his consent to Purotecs to bring potential future clients out to plaintiff's facility to look at the system.

Based on the foregoing, we conclude the trial court's foundational finding that Purotecs acquired Invenx's principal assets was supported by substantial evidence.

B. Successor Liability Ground: An Express or Implied Agreement to Assume Contract Obligation

One of the grounds stated by the trial court for finding Purotecs liable as Invenx's successor was that Purotecs expressly and/or impliedly agreed to assume Invenx's responsibilities under the contract. As noted above, an express or implied agreement to assume the predecessor corporation's liability is one of the recognized grounds for finding successor liability. (*Ray*, *supra*, 19 Cal.3d at p. 28.) The basis for the trial court's finding on this matter was explained in its Statement of Decision as follows:

15.

"[B]oth Mr. Stevens and Mr. Ditzler told [plaintiff's] principal, Ken Alldrin, that Purotecs was taking over the Invenx project and wanted to get the system validated and sell it to Purotecs' other customers. [Plaintiff's] plant managers Ms. Valdovinos and Mr. Camp were also told by Mr. Stevens and Mr. Ditzler that Purotecs was taking over the project. Mr. Stevens and Mr. Ditzler's conduct thereafter, in working on the system with other Purotecs employees, and sending letters and emails to [plaintiff] in Purotecs' name, also proves an implied agreement. As further evidence of that agreement, Invenx did not give notice or list [plaintiff] as a creditor in the 2013 bankruptcy."[4]

We agree with the trial court that Purotecs' promises to take over and complete the project may reasonably be construed as an agreement on its part to assume and carry out Invenx's contractual responsibilities to plaintiff. Under the circumstances, it may also be inferred that Invenx's failure to list or give notice to plaintiff as a creditor in Invenx's 2013 bankruptcy was due to the fact Purotecs had assumed its contractual obligations to plaintiff in 2012. On balance, we conclude there was substantial evidence in the record to support the trial court's conclusion that Purotecs expressly or impliedly agreed to assume Invenx's contractual obligations to plaintiff. This provided a sufficient ground for establishing Purotecs' successor liability.

C. Additional Successor Liability Ground: Purotecs a Mere Continuation of Invenx

The trial court found successor liability existed on the additional ground that Purotecs was the mere continuation of Invenx. (*Ray, supra*, 19 Cal.3d at p. 28 [successor liability may be found where "the purchasing corporation is a mere continuation of the seller"].) As noted hereinabove, to support a finding that a corporation is a mere continuation of its predecessor, one or both of the following factual bases must be shown: "(1) no adequate consideration was given for the predecessor corporation's assets and

---

[4] See footnote 2, *ante*.

made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." (*Id.,* at p. 29; accord, *Wolf Metals, supra,* 4 Cal.App.5th at p. 705.)

In its Statement of Decision, the trial court found both factual scenarios were present in this case, explaining as follows: "The preponderance of the evidence showed that Purotecs is a continuation of Invenx. Mr. Ditzler was an officer, director and stockholder of both companies. Further the evidence discussed herein shows that Purotecs 'effectively absorbed' Invenx's business franchise without paying adequate cash consideration to Invenx. [¶] Lastly, the court finds that Invenx did not receive substantial value for the transfer of its assets to Purotecs, and thereafter was left with no funds to pay its creditors. According to its bankruptcy filings, Invenx received from Purotecs either (a) payment of its outstanding rent on its storage unit in exchange for delivering all of its assets to Purotecs, or (b) $20,000. Either sum is insubstantial, particularly in light of the fact that following the transfer of its assets, Invenx had no assets [but had] liabilities of over $1.2 million, and was not able to pay any of its creditors, while Mr. Ditzler received a signing bonus, salary, and stock in Purotecs."[5]

Substantial evidence supported the trial court's findings of a mere continuation. First, there is no dispute that Ditzler was an owner/shareholder, president and founder of Invenx, and the record establishes that Ditzler was *also* an officer, director and shareholder in Purotecs. Thus, one supporting basis for holding that Purotecs was a mere continuation existed; i.e., "one or more persons were officers, directors, or stockholders of both corporations." (*Ray*, *supra*, 19 Cal.3d at p. 29.)

Second, as further confirmation that Purotecs was a mere continuation of Invenx, the record clearly substantiated that no adequate consideration was given for Invenx's corporate assets and made available for meeting the claims of its unsecured creditors.

---

[5] See footnote 2, *ante*.

17.

(See, *Ray, supra,* 19 Cal.3d at p. 29.)  Depending on which bankruptcy filing is referenced, Invenx received from Purotecs either (a) payment of outstanding rent on its storage unit in exchange for delivery of all its assets to Purotecs, or (b) $20,000.  As the trial court found, either sum is insubstantial, "particularly in light of the fact that following transfer of its assets, Invenx had no assets [but had] liabilities of over $1.2 million, and was not able to pay any of its creditors, while Mr. Ditzler received a signing bonus, salary and stock in Purotecs."  The bankruptcy filings support the trial court's determination on this matter.

Finally, we recognize that implicit to the mere continuation analysis is that the "new corporation is, in reality, but a continuation of the old." (*Cleveland, supra,* 209 Cal.App.4th at p. 1327.)  Here, the evidence that Purotecs not only continued in the ozone equipment business, but also agreed to take over completing plaintiff's system, getting it validated, and using it as an example to show future clients of Purotecs was sufficient to substantiate that Purotecs was, in fact, carrying out and continuing the same or substantially the same business enterprise.  Thus, substantial evidence supported the trial court's finding that Purotecs continued and "'effectively absorbed' Invenx's business franchise without paying adequate cash consideration to Invenx."

Because successor liability is adequately established by substantial evidence as explained above, defendants' contentions that the record included some evidence to the contrary does not demonstrate that error occurred.  "The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.  An appellant…who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment." (*Rayii, supra*, 218 Cal.App.4th at p. 1408.)  For this reason, defendants' assertions that some contrary evidence existed in the record on this issue, including (i) Ditzler's testimony that even though Invenx's bankruptcy filings showed no intellectual property assets existed when

the bankruptcy was filed, Higgins later purportedly told Ditzler he purchased such assets from the bankruptcy, (ii) testimony to the effect that Purotecs' business focused on ozone generators rather than complete systems, and (iii) evidence that only office equipment was purchased from Invenx by Purotecs, is insufficient to demonstrate that any error occurred. To reiterate, "We do not reweigh the evidence, consider the credibility of the witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. [Citation.] If substantial evidence exists, it is of no consequence that the trial court [if] believing other evidence or drawing other reasonable inferences might have reached a contrary conclusion." (*Picerne, supra,* 244 Cal.App.4th at pp. 1208-1209.)

In conclusion, substantial evidence supported the trial court's findings on successor liability and defendants' selective evidentiary references have failed to show otherwise.

## IV. Statute of Frauds Does Not Preclude Successor Liability

Civil Code section 1624, subdivision (a), provides that "[t]he following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: … (2) A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in Section 2794." (Civ. Code, § 1624, subd. (a)(2).) Defendants argue that because Purotecs was not itself a signatory to the written contract, but rather Invenx was, Purotecs cannot be held liable because it would violate the above provision of the statute of frauds. The trial court disagreed, holding the statute of frauds was inapplicable because Purotecs was not being found liable as a surety or guarantor of another's debt, but rather as a successor corporation. We agree with the trial court's holding on this issue.

As has been discussed, Purotecs' liability was premised on the equitable doctrine of successor liability. Under that theory, Purotecs was not being sued to enforce a special contractual promise to answer for the debt or default of another, but rather as the

19.

successor and mere continuation of its predecessor corporation, Invenx. " '[C]orporations cannot escape liability by a mere change of name or a shift of assets when and where *it is shown that the new corporation is*, *in reality*, *but a continuation of the old*. Especially is this well settled when … the rights of creditors are involved, under which circumstances the courts uniformly hold the new corporation liable for the debts of the former corporation.' " (*McClellan, supra,* 89 Cal.App.4th at p. 754, quoting *Blank v. Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456, 461.) A successor corporation's liability under this theory may be determined by various procedural means, including an action naming the successor corporation as the actual defendant, such as occurred here. (See *McClellan, supra,* 89 Cal.App.4th at pp. 753-754 [noting means of filing an action against former corporation's successor].) In practical effect, the doctrine of successor liability is comparable to how alter-ego or the equitable disregard of the corporate entity may be applied. (See, e.g., *Wolf Metals, supra,* 4 Cal.App.5th at pp. 703-705 [potential addition of judgment debtor considered under successor corporation theory and alter ego]; *Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 823-824 (*Brown Bark*) [successor corporation liability compared to alter-ego].) Thus, successor liability is not an attempt to enforce a new obligation or promise, but a recognition by our courts that liability on an existing claim or cause of action may be extended to the successor corporation as a mere continuation of the old corporation. (*Brown Bark, supra,* 219 Cal.App.4th at pp. 822-823 [successor liability "is not a separate claim independent of [the plaintiff's] breach of contract claims"].)

For these reasons, we conclude the statute of frauds was inapplicable. The claim against Purotecs was *not* to enforce a special contractual promise to answer for the debt of another,[6] but was on the original contract signed by Invenx – which liability was

---

[6] Although the trial court did find that Purotecs represented it was taking over or assuming the responsibility to complete the contract with plaintiff, such representations

20.

properly extended to Purotecs, as the purchaser/acquirer of Invenx's assets, where the facts and circumstances showed that Purotecs should be and was legally responsible as the successor and mere continuation of Invenx.[7]

## V.  Equal Dignities Rule Inapplicable

Defendants argue that Civil Code section 2309, known as the equal dignities rule, precludes Purotecs' successor liability.  We disagree.  Civil Code section 2309 has to do with the form of authority of an agent; i.e., written versus oral.  As stated in *Estate of Stephens* (2002) 28 Cal.4th 665, 672:  "[T]he 'equal dignities' rule of Civil Code section 2309 … provides that a principal's *oral* authorization to an agent 'is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing.' " (*Id*. at p. 672, citing Civ. Code, § 2309.)  The statute has no application here.  Defendants have failed to present any statutory or other authority for the proposition that successor liability requires a written instrument between the predecessor and successor corporations, and we have found none.  Since no written contract is required, the equal dignities rule does not come into play.

---

or promises on Purotecs' part were considered solely as one of the *factors* or factual elements supporting the conclusion that Purotecs was liable as a successor corporation.

[7] Plaintiff argues in its respondent's brief herein that "even if" the statute of frauds did apply, various exceptions stated in Civil Code section 2794 were applicable. (See, Civ. Code, § 1624(a)(2).)  We find it unnecessary to address plaintiff's alternative arguments.

## **DISPOSITION**

The judgment is affirmed.  Plaintiff is awarded its costs on appeal.


                                                     SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


SMITH, J.


22.